**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **VINCENT SIMS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 11-2946-STA-cgc** |
| | ) | |
| **BRUCE WESTBROOKS, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ORDER GRANTING IN PART AND DENYING IN PART**
**PETITIONER'S MOTION FOR LEAVE TO CONDUCT DISCOVERY**

---

On January 4, 2016, Petitioner Vincent Sims, through counsel, filed a motion for leave to conduct discovery and a supporting memorandum. (Electronic Case Filing ("ECF") Nos. 69 & 70.) On February 18, 2016, Respondent Bruce Westbrooks filed a response. (ECF No. 75.) On March 3, 2016, Sims filed a reply. (ECF No. 78.)

**I.    BACKGROUND**

In May 1998, Sims was convicted of especially aggravated burglary of Forrest Smith's home and first degree premeditated murder for Smith's subsequent death. *Sims v. State*, No. W2014-00166-CCA-R3-PD, 2014 WL 7334202, at *1 (Tenn. Crim. App. Dec. 23, 2014). Sims received consecutive sentences of 25 years for especially aggravated burglary and death for first degree premeditated murder. *Id.* The jury found four aggravating circumstances to support the death sentence: (1) Sims had been convicted previously of one or more felonies with statutory elements that involve the use of violence against the person; (2) the murder was especially heinous, atrocious, or cruel; (3) the murder was committed for the purpose of avoiding,

interfering with, or preventing a lawful arrest or prosecution of Sims or another; and (4) the murder was committed during the commission of a burglary or theft. *See* Tenn. Code Ann. § 39–13–204(i)(2), (5), (6), (7) (1997). *Id.* (*See* ECF No. 46-16 at PageID 2262-2264.)[1]

The Tennessee Court of Criminal Appeals summarized the guilt phase evidence as follows:

> On April 5, 1996, Forrest Smith arrived home from work around 10:00 p.m. He found the [Petitioner], Vincent Sims, and Sims's [teenage] cousin, Brian Mitchell, in the process of burglarizing his home. Mitchell testified that Sims had called him earlier in the evening asking for help in moving a big screen television from a house Sims had burglarized. Sims picked up Mitchell in a borrowed Toyota Camry belonging to Sims's girlfriend. They drove to Smith's house, parked the car under the carport, and loaded the big screen television in the trunk. Sims and Mitchell were in the house disconnecting a computer when Smith arrived. Smith parked his Jeep in the driveway to block the other vehicle's exit. When Smith entered the house, Sims and Mitchell ran outside but were unable to get the Camry out of the driveway. Sims went back into the house while Mitchell remained outside.
>
> Mitchell testified that he heard Sims yelling at Smith to give Sims the keys to the Jeep. Mitchell then heard eight or nine gunshots fired inside the house. Sims returned carrying Smith's .380 caliber chrome pistol and the keys to the Jeep. Sims was holding his side and told Mitchell that he had been shot. Sims threw Mitchell the keys to move the Jeep, and the two fled the scene in the Camry. Mitchell testified that Sims told him that Sims and Smith had fought over the .380 caliber pistol and that Sims had shot Smith. Sims told Mitchell that Sims had to kill Smith because Smith had seen Sims's face. Sims instructed Mitchell not to talk to anyone about what had happened and later threatened Mitchell's life after they were in custody.
>
> Smith's girlfriend, Patricia Henson, arrived at the home shortly after the shooting, sometime between 10:00 and 10:30 p.m. Smith was lying on the kitchen floor in a pool of blood, but he was conscious and asked Henson to call 911. When asked what had happened, Smith was able to tell Henson and Officer Donald Crowe that there had been a robbery and that Smith had been shot in the head. Officer Crowe testified that Smith was bleeding from several parts of his body, appeared to have been shot more than once, and was in severe pain. After receiving treatment by paramedics on the scene, Smith was transported to the hospital. He died approximately four and a half hours later.

---

[1] "PageID" references are used to locate information in the state court record and exhibits filed on CM-ECF.

In the meantime, Sims took Mitchell home and picked up Sims's girlfriend, Tiffany Maxwell, from work after she clocked out at 11:05 p.m. Maxwell testified that Sims was visibly upset and had blood on his shirt. Upon inquiry, Sims told her that someone had attempted to rob him. Maxwell also noticed that he had a "deep scar" injury on his side, which she treated herself after Sims refused to go to the hospital. The following morning, Sims and Maxwell took Maxwell's car to be washed and detailed. Maxwell then noticed that the license plate frame on her car was broken. Sims and Maxwell attended an Easter Sunday church service the next morning. According to Maxwell, Sims behaved normally with nothing unusual occurring until the following Tuesday when Sims was arrested at Maxwell's place of employment.

After Sims and Mitchell were in custody, Sims gave Mitchell a letter to deliver to Mitchell's attorney. In that letter, Sims recalled the events surrounding the burglary and murder. Sims alleged that Smith had fired at Sims and Mitchell as they fled the house. Mitchell testified that this portion of the letter was untrue. Mitchell maintained that no shots were fired until Sims went back inside the house to get Smith's keys to the Jeep. Sims also contended in the letter that Smith was accidentally shot in the head while the two struggled over the .380 caliber pistol.

Significantly, however, the bullet removed from Smith's brain was a .22 caliber bullet. The police also recovered fragments from three or four .22 caliber bullets at the scene. Mitchell testified that he had seen Sims with a long barrel .22 caliber revolver with a brown handle earlier in the evening. Although Mitchell did not see Sims with the revolver during the burglary, he did see something protruding under Sims's shirt. In addition to the .22 caliber bullets, the police found a bullet fragment from a probable .380 caliber bullet and five fired .380 caliber cartridge cases at the scene. Officers also recovered from Smith's carport a beeper that was later identified as belonging to Sims and the broken license plate frame from Maxwell's car.

Forensic pathologist Wendy Gunther performed the autopsy on Smith. She testified that Smith suffered a gunshot entry and exit wound to his head. Part of the bullet entered Smith's brain and lodged in his skull above his right eye, and the other piece exited in front of his right ear. Smith also suffered multiple blows to his head, neck, shoulders, arms, sides, back, and buttocks. The bruising indicated that Smith had been struck with a long, narrow, rod-shaped object at least a quarter inch wide. Dr. Gunther estimated that Smith had been struck at least ten times but probably many more. She stated that the blows were very hard as evidenced by the immediate bruising on Smith's body. Smith suffered at least six blows to his head, one of which fractured his skull at the back of his head. Dr. Steven Symes, a forensic anthropologist, opined that this head injury was inflicted after the gunshot wound to Smith's head. Although the gunshot wound to the head was the worst injury and would by itself have caused death, Dr. Gunther testified

that the cause of death was a combination of all of the injuries.

Based upon the above evidence, the jury convicted Sims of especially aggravated burglary and first degree premeditated murder.

*Sims*, 2014 WL 7334202, at *1-3.

## II.    DISCOVERY REQUESTS

Petitioner requests leave to serve the following subpoenas for:

1.      Documents in the possession, custody, or control of the District Attorney General's Office for Tennessee's 30th Judicial District respecting the State's dealings with, and prosecution of, Brian Mitchell;

2.      The depositions of Assistant District Attorneys General James Lammey and Lee Coffee;

3.      The depositions of Memphis Police Officers J. W. Bouchillon, E. E. Cash, Donald Crowe, C. E. Logan, and James Nichols;

4.      Documents the Tennessee Bureau of Investigation (TBI) obtained, reviewed, and/or created respecting tests the TBI performed on crime scene evidence; and

5.      A Memphis Police Department crime scene file currently in the possession of Karon Corbitt.

(ECF No. 69 at 1.)

## III.   STANDARD

Habeas petitioners do not have an automatic right to discovery.  *See Johnson v. Mitchell*,

585 F.3d 923, 934 (6th Cir. 2009) (quoting *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir.

2001)).  Discovery in habeas cases is controlled by Rule 6(a) of the Rules Governing Section

2254 Cases in the United States District Courts ("Habeas Rules"), which states: "A judge may,

for good cause, authorize a party to conduct discovery under the Federal Rules of Civil

Procedure and may limit the extent of discovery."  *See Cornwell v. Bradshaw*, 559 F.3d 398, 410

(6th Cir. 2009) ("For good cause shown, the district court has the discretion to permit discovery

in a habeas proceeding . . . ."). Habeas Rule 6 is meant to be "consistent" with the Supreme

Court's decision in *Harris v. Nelson*, 394 U.S. 286 (1969). *Bracy v. Gramley*, 520 U.S. 899, 909

(1997). In *Harris*, the Court stated:

> [W]here specific allegations before the court show reason to believe that
> the petitioner may, if the facts are fully developed, be able to demonstrate that he
> is confined illegally and is therefore entitled to relief, it is the duty of the court to
> provide the necessary facilities and procedures for an adequate inquiry.

*Harris*, 394 U.S. at 300.

"Good cause" is not demonstrated by "bald assertions" or "conclusory allegations."

*Stanford*, 266 F.3d at 460; *see Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004). Rather, the

requested discovery must be materially related to claims raised in the habeas petition and likely

to "resolve any factual disputes that could entitle [the petitioner] to relief." *Williams*, 380 F.3d at

975 (quoting *Stanford*, 266 F.3d at 460) (internal quotation marks omitted); *see Bracy*, 520 U.S.

at 908-909 (allowing discovery relevant to "specific allegations" of fact in support of a claim of

constitutional error); *Post v. Bradshaw*, 621 F.3d 406, 425 (6th Cir. 2010) (stating that discovery

provides petitioner "that extra evidence he . . . needs to prove or strengthen his case"); *Braden v.

Bagley*, No. 2:04-CV-842, 2007 WL 1026454, at *2 (S.D. Ohio Mar. 30, 2007) ("Rule 6's 'good

cause' standard requires petitioner to at least attempt to identify what he expects to uncover

through his discovery requests.").[2] Although "more liberal discovery is appropriate in capital

[habeas] cases," *Payne v. Bell*, 89 F. Supp. 2d 967, 971 (W.D. Tenn. 2000) (citing *Lockett v.

Ohio*, 438 U.S. 586, 604 (1978)), Rule 6(a) does not permit a "fishing expedition masquerading

---

[2] "The Sixth Circuit has not determined whether § 2254(e)(2) applies to motions for discovery." *Hill v. Anderson*, 4:96CV0795, 2010 WL 5178699, at *8 (N.D. Ohio Dec. 14, 2010). A petitioner may show good cause under Habeas Rule 6 without meeting the higher standard for an evidentiary hearing in 28 U.S.C. § 2254(e)(2). *Payne*, 89 F. Supp. 2d at 970; *see Braden*, 2007 WL 1026454, at *6 (distinguishing discovery from factual development under § 2254(e)(2)); *see also Simmons v. Simpson,* No. 3:07-CV-313-S, 2009 WL 4927679, at *5-6 (W.D. Ky. Feb. 12, 2009) (stating that this view is not unanimously held by federal courts).

as discovery." *Stanford*, 266 F.3d at 460.

There is no clear entitlement to discovery in support of procedurally defaulted habeas claims. *See Williams,* 380 F.3d at 975-976 (finding no error in district court's denial of discovery on procedurally defaulted ineffective assistance of counsel claims); *Royal v. Taylor*, 188 F.3d 239, 249 (4th Cir. 1999) (finding no error in district court's denial of discovery on procedurally defaulted due process claims); *Calderon v. U.S. Dist. Court for the N. Dist. of Ca.*, 98 F.3d 1102, 1106 (9th Cir. 1996) (issuing mandamus to prevent discovery awarded by district court because petitioner had not filed a habeas petition with exhausted claims or sought such discovery in the state court); *Sherman v. McDaniel*, 333 F. Supp. 2d 960, 969-970 (D. Nev. 2004) (denying discovery on unexhausted claims because "[t]o do so would tend to undermine the exhaustion requirement, and the doctrine of federal-state comity on which it rests"). *But see Conway v. Houk,* No. 3:07-cv-345, 2009 WL 961199, at *3 (S.D. Ohio Apr. 8, 2009) ("So long as the procedural default defense has not been adjudicated, its pleading does not provide a basis to deny discovery."); *Hutton v. Mitchell*, No. 1:05-CV-2391, 2008 WL 4283318, at *2 (N.D. Ohio Sept. 16, 2008) (allegations of procedural default will not automatically bar discovery). However, "a habeas petitioner may use a Habeas Rule 6 discovery motion to obtain evidence relevant to excusing procedural default." *Payne*, 89 F. Supp. 2d at 974 (granting discovery motion in support of a presumptively defaulted claim because the motion sought to discover evidence which would allow the petitioner to obtain a factual basis to excuse default, his "actual innocence"); *see Braden*, 2007 WL 1026454, at *10 (granting the deposition of a mitigation specialist where the request was reasonably calculated to lead to evidence that could demonstrate a justification for excusing the apparent default of the petitioner's claim). Since procedural default may not automatically bar discovery in habeas cases, discovery may be allowed if it

would uncover proof that could justify the apparent procedural default of Sims' claims.

## IV.     RELEVANT CLAIMS

Sims seeks discovery related to his *Brady*, false testimony, and prosecutorial misconduct claims (Claims 3-5.)  (ECF No. 70 at 5.)  Respondent argues that each of the claims for which Sims seeks additional discovery is procedurally defaulted.  (ECF No. 75 at 7, 12.)[3]

### A.     *Brady* (Claim 3)

A *Brady* violation occurs if three conditions are met: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–282 (1999).  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *see Kennedy v. Mackie*, No. 14-2342, 2016 WL 232133, at *3 (6th Cir. Jan. 19, 2016).

Sims seeks discovery related to his allegations that the prosecution withheld material, exculpatory and impeaching evidence.  Claim 3 of the Second Amended Petition includes allegations that the State withheld evidence including:

1. Mitchell's juvenile records;

2. Mitchell's psychological evaluations:

3. Evidence that the State indicated it might/would dismiss murder and/or automobile theft charges if Mitchell testified against Sims;

---

[3] In Respondent's Answer to the Second Amended Petition, he asserts that Claims 3 and 4 are procedurally defaulted and that Sims is not entitled to habeas relief for Claim 5.  (ECF No. 52 at 16-18.)  For Claim 5, Respondent argues that, to the extent Sims' allegations in paragraphs 216, 217, and 218 of the Second Amended Petition "differ in kind or otherwise exceed the allegations of the state court's filings", the allegations are procedurally defaulted.  (*Id.* at 18.)

4. Evidence that the State indicated it might/would consider limiting Mitchell's exposure for his participation in the incident and for other pending charges if he testified against Sims;

5. Evidence that the State indicated it might/would make sentencing recommendations upon Mitchell's subsequent guilty plea and/or not object to any attempts Mitchell might make to secure favorable terms for his sentence if he testified against Sims;

6. Evidence that the State indicated that it might/would provide or consider providing Mitchell some unspecified favorable consideration if he testified against Sims;

7. Evidence that prior to trial, prosecutor Lee Coffee told Mitchell that after he testified, if the case came to a conclusion satisfactory to the prosecution, the State would review the testimony with Smith's family, allow their evaluation of the testimony, and make a recommendation about disposition of the charges against Mitchell;

8. Evidence that Mitchell was lying, specifically that
   - Mitchell was lying when he testified that, on the day of the incident, he saw Sims with a long barreled .22 caliber pistol (¶ 208.8.1);
   - Mitchell was lying when he testified that, on the car ride to Smith's house and during the burglary[,] he saw a bulge in Sims' pants which could have been created by a pistol (¶ 208.8.2); and
   - Mitchell was lying when he testified that he did not see Smith with a weapon (¶ 208.8.3);

9. Evidence of what happened in Smith's home, specifically that
   - Smith was shot during a struggle for a gun and not as a result of a cold blooded act of premeditation (¶ 208.9.4);
   - The evidence found at the crime scene did not support a finding that .22 caliber pistol was fired during the incident (¶ 208.9.5); and
   - The procedures Memphis Police used to accumulate evidence that was presented at Sims' trial allowed authorities to manipulate evidence to support a finding that a .22 caliber pistol was fired during the incident (¶ 208.9.6); and

10. Evidence indicating that the gunshot wound to Smith's head was caused by a .380 pistol that Smith owned (¶ 208.10).

(*See* ECF No. 70 at 22 n.62, 24 n. 71 & 72; *see also* ECF No. 45 at 67-71.)

### B.     False Testimony (Claim 4)

Sims seeks discovery to support his false testimony claim. To prove his false testimony claim, *Sims* must show that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. *In Peoples v. Lafler*, 734 F.3d 503, 516 (6th Cir.

2013). Testimony is material only if there is any reasonable likelihood that it affected the judgment of the jury. *Id.* at 516.

Sims seeks discovery to support his allegations that the prosecution presented and/or condoned Brian Mitchell's false testimony. Claim 4 involves allegations that Mitchell testified falsely that:

1. He saw Sims with a long barreled .22 caliber pistol on the day of the incident (¶ 212.1);
2. On the car ride to Smith's house and during the burglary, Mitchell saw a bulge in Sims' pants which could have been created by a pistol (¶ 212.2);
3. At no time during the incident did Mitchell see Smith with a weapon (¶ 212.3);
4. Sims told Mitchell that Sims had to shoot Smith because Smith had seen his face;
5. Sims told Mitchell that he shot Smith about two times;
6. Mitchell's April 9, 1996, 8:07 p.m. statement was the first time he spoke to authorities about the facts and circumstances of the crime;
7. Mitchell has never given a statement that conflicted in any way with the testimony he gave at trial;
8. Nobody made Mitchell any deals or threatened him in order for him to testify;
9. He expected to face the full range of punishment at his subsequent trial;
10. He did not expect any bargain for his testimony;
11. No one advised him that in return for his testimony the first-degree murder charge against him might be reduced; and
12. He did not know whether it was a possibility that in return for his testimony the first-degree murder charge against him might be reduced.

(*See* ECF No. 45 at 72-73; *see also* ECF No. 70 at 22 n.63.)

## C. Prosecutorial Misconduct (Claim 5)

To prove prosecutorial misconduct, "it is not enough that the prosecutor's [conduct was] undesirable or even universally condemned[,]" the prosecution's conduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gumm v. Mitchell*, 775 F.3d 345, 378 (6th Cir. 2014). In *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000), the Sixth Circuit stated that the court must first determine whether the challenged statements were indeed improper. Upon a finding of impropriety, the court must determine

whether the statement was so "flagrant" as to warrant reversal. *Id.* "Flagrancy is determined by an examination of four factors: '1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused.'" *Id.* (quoting *United States v. Francis*, 170 F.3d 546, 549-550 (6th Cir. 1999); *see United States v. Lawrence*, 735 F.3d 385, 431-432 (6th Cir. 2013) (same).

Sims seeks discovery to support the allegations that the prosecution engaged in misconduct in its arguments, when:

- In opening and closing statements, the prosecution asserted that Sims shot Smith because Smith had seen his face even though the prosecution was aware that was not the case (¶ 216);

- In closing argument at the guilt stage, the prosecution asserted that Sims carried a .22 pistol with him during the incident even though the prosecution knew that there was no reliable evidence that Sims had a gun that night (¶ 217);

- In closing argument at the guilt stage, the prosecution asserted that Sims went into Smith's house to execute him even though the prosecution was aware that this was not the case (¶ 218);

- In closing argument at the guilt stage, the prosecution asserted Sims shot Smith in the head when Smith was lying on the floor even though the prosecution knew that:
  1. The characteristics of the gunshot wound to Smith's head were inconsistent with speculation that he was lying on the floor when he was shot; and
  2. There was no reliable evidence that Smith was lying on the floor when he was shot (¶ 219); and

- In closing argument at the guilt stage, Assistant District Attorney Coffee misinformed jurors when he told them:
  1. "I don't make deals with criminals;" and
  2. Mitchell had no motivation to testify for the State (¶ 220).

(*See* ECF No. 70 at 5 n.1, 17, 18, 20, 22 n.64, 24 n.73; *see also* ECF No. 45 at 73-74.)

## V.    ANALYSIS

Sims contends that the Memphis Police Homicide Bureau concluded that Forrest Smith was shot during a struggle with Sims over a gun.  (ECF No. 70 at 1; *see* ECF No. 70-1 at PageID 5985 ("a fight and scuffle ensued between the victim and the intruders").)  At trial, the prosecution presented the theory, supported by co-defendant Brian Mitchell's testimony, that Sims told Mitchell that Sims deliberately shot Smith because Smith "saw his face".  (ECF No. 70 at 1.)  Mitchell's initial police statement does not mention that Sims shot Smith because he saw Sims' face.  (*Id.*)

Sims argues that Mitchell was subjected to hours of custodial interrogation and only then did he say that Sims shot Smith in the face, head, and neck because Smith saw his face.  (*Id.*)  Sims asserts that the forensic evidence contradicts Mitchell's statement because Smith was shot once.  (*Id.*)  However, at the time that the police were interrogating Mitchell, the police believed that Sims had shot Smith multiple times.  (*Id.*)

Mitchell assured the jury that the prosecution gave him no incentive to testify.  (*Id.* at 1.)  In closing argument, the prosecution asserted that Mitchell had no reason to lie.  (*Id.* at 2.)  However, at the post-conviction evidentiary hearing, Coffee acknowledged that he told Mitchell the prosecution would make a favorable recommendation on the charges pending against him if Smith's family was satisfied with Mitchell's testimony.  (*Id.*; ECF No. 47-11 at PageID 3761-3762.)

Sims argues that he is entitled to discovery to prove his withheld evidence, false testimony, and prosecutorial misconduct claims.  (ECF No. 70 at 2.)  He contends that the presently available evidence supports his claims and contradicts Mitchell's testimony.  (*Id.* at 3.)  Sims argues that discovery will allow him to overcome procedural default.  (*Id.* at 3-4.)

Sims asserts that the Homicide Bureau Report was written after a three-month long investigation, summarizes the investigation, and presents conclusions about the facts and circumstances of the crime. (*Id.* at 5-6.) He refers to it as the "final Homicide Bureau Report" He contends that the report supports his claims. (*Id.* at 2.) He cites the report for the proposition that a fight and scuffle occurred between Sims and Smith:

> The victim ... entered his residence went to a rear bedroom without being noticed by the intruders, retrieved a .380 pistol from a dresser draw[er] and then confronted the intruders. A fight and scuffle ensued between the victim and the intruders, resulting in the death of the victim. The victim was beaten, stomped, kicked and shot once in the head, with what investigators believe to be his .380 pistol that was taken from him by the intruders.

(*Id.* at 6; *see* ECF No. 70-1 at PageID 5985.) Sims asserts that the Homicide Bureau Report was partially based on information provided by Officers Crowe and Bouchillon, who were the first officers on the scene. (ECF No. 70 at 6.)[4] He contends that these officers spoke with Smith before he was transported for medical treatment. (*Id.*)

On April 9, 1996, the police arrested Mitchell, and Officers E.E. Cash and James Nichols questioned him. (*Id.* at 6.) Mitchell stated:

> [H]e and Vincent ran outside and noted that they were blocked in by another vehicle. Brian stated that Vincent went back inside to get the key from the white man to move the vehicle so they could leave and that is how the white man got shot and killed.

(*Id.*; *see* ECF No. 70-2 at PageID 5989.) Sims contends that Mitchell's account of the events turned more sinister after hours of custodial interrogation. (ECF No. 70 at 6-7.)

In a written statement taken the night of Mitchell's arrest, Mitchell, for the first time, claimed that Sims shot Smith because Smith saw his face:

> (Sims) told me he had shot the white man in his head, and in the face, and the neck. And then I had asked him why did he have to shoot the guy. Then he said

---

[4] Bouchillon is not mentioned in the report. (*See* ECF No. 70-1 at PageID 5985.)

that he had saw our face and he had to kill him. That's it.

(*Id.* at 7; *see* ECF No. 70-4 at PageID 5995.)  Sims argues that Mitchell's "'new and improved' story" reflects the police's misperceptions about Smith's wounds at the time they questioned him".  (ECF No. 70 at 7.)  The autopsy revealed that what police perceived as multiple gunshot wounds were actually wounds caused by impacts from a rod-shaped object.  (*Id.*)

Sims asserts that Mitchell had borderline intelligence, was naïve, and lacked maturity. (*Id.* at 7-8.)  Sims argues that the inconsistency in facts suggests that the police fed Mitchell false information to obtain this "new and improved" statement.  (*Id.* at 7.)

Sims argues that the prosecution stated in opening argument that Sims killed Smith "for one reason and one reason only: Smith saw his face."  (*Id.* at 8; *see* ECF No. 46-12 at PageID 1650-1652.)[5]  Mitchell provided the only testimony that supported this theory.  (ECF No. 70 at 8.)  During Mitchell's testimony, the prosecution went into a colloquy with Mitchell to eliminate any jury concern that he was lying and to pin blame on Sims.  (*Id.* at 8-9; *see* ECF No. 46-14 at PageID 1885.)  Mitchell continued to support his story on cross-examination.  (ECF No. 70 at 9-10; *see* ECF No. 46-14 at PageID 1886-1888.)

Just over two weeks after the trial court denied Sims' motion for a new trial, Mitchell entered a guilty plea.  (ECF No. 70 at 11.)  At the plea hearing, Coffee informed the court that the prosecution had reviewed Mitchell's testimony with Smith's family and discussed an appropriate recommendation for the disposition of Mitchell's charges.  (*Id.*)  With Smith's family's consent, Coffee recommended that the court accept Mitchell's plea to especially aggravated burglary, and the murder charges were dropped.  (*Id.* at 11-12; *see* ECF No. 70-10 at PageID 6029-6030.)

---

[5] The prosecution sought the death penalty based on four aggravating circumstances, *see supra* pp. 1-2, not just the avoiding arrest aggravating circumstance.

Sims argues discovery will allow him to establish cause and prejudice for a default of the *Brady* and false testimony claims. (ECF No. 70 at 13-14.) He asserts that, to the extent he proves these due process claims, he, by definition, overcomes any alleged procedural default. (*Id.* at 14.)

Respondent argues that each of Sims' claims is procedurally defaulted. (ECF No. 75 at 7.) Respondent asserts that Sims must establish: (1) cause and prejudice to excuse the procedural default; (2) a specific basis to affirm that the requested materials would yield the asserted information; and (3) that the information, if obtained, would support the elements of Sims' *Brady*, *Giglio*, and prosecutorial misconduct claims. (*Id.* at 8.) Respondent contends that Sims fails to state sufficient facts to make a showing of good cause and to demonstrate that the requested materials would provide beneficial information. (*Id.*) Respondent argues that the requests are overbroad and not duly specific. (*Id.*)

## A.    District Attorney's File for Brian Mitchell (Request 1)

Sims requests discovery of "[d]ocuments in the possession, custody, or control of the District Attorney General's Office for Tennessee's 30th Judicial District respecting the State's dealings with, and prosecution of, Brian Mitchell." (ECF No. 69 at 1.) Sims argues that, without Mitchell's testimony, the prosecution could not have secured the premeditated murder conviction. (ECF No. 70 at 15.) Sims contends that the currently available evidence establishes that the prosecution withheld evidence showing Mitchell had an incentive to testify. (*Id.* at 15-16.) Sims argues that discovery is "particularly appropriate" for Sims' allegations of out-of-court prosecutorial misconduct. (*Id.* at 16.)[6] He asserts that this Court has granted discovery of

---

[6] Claim 5 relates to prosecutorial misconduct in opening and closing arguments, not out-of-court conduct. (*See* ECF No. 45 at 73-75.) The Court presumes that Sims is referring to his *Brady* allegations. Sims' suggestion that the police convinced Mitchell to testify based on

relevant district attorney's files to investigate and present such claims.  (*Id.*)  Sims argues that the Court recognized that he has established good cause to conduct discovery on his due process claims, and has "in effect, already determined that Mr. Sims has shown good cause to discover District Attorney General documents respecting Mitchell."  (*Id.* at 17.)

Respondent argues that the agreement for Sims' prosecution file does not demonstrate that Sims is entitled to copy and review Mitchell's file.  (ECF No. 75 at 8.)  Respondent contends that Sims has failed to show how the information requested would establish: (1) cause and prejudice to excuse the procedural default; (2) a specific basis to affirm that the requested materials would yield the asserted information; and (3) that the information, if obtained, would support the elements of Sims' *Brady*, *Giglio*, and prosecutorial misconduct claims.  (*Id.*)  Respondent argues that the purported nexus between Mitchell's testimony and Sims' claim of prosecutorial misconduct is wholly speculative and not supported by the record.  (*Id.* at 8-9.)

Sims asserts that he has made a preliminary showing that the prosecution violated due process when it withheld exculpatory evidence, presented false testimony, and misled the jury.  (ECF No. 78 at 1.)  He asserts that this preliminary showing establishes good cause for the requested discovery.  (*Id.*)  Sims disputes Respondent's assertion that his request is "wholly speculative and unsupported by the record."  (*Id*. at 3.)  Sims argues that he relies on the specific record citations about Mitchell's incentive to testify, his false testimony, and the Court's determination that Sims has shown good cause for Sims' prosecution file to support this discovery request.  (*Id.* at 2-3.)  Sims contends that he cannot provide an exhaustive list of what evidence he expects to find because the State has withheld evidence.  (*Id.* at 2.)

---

information the officers gave him about Smith's wounds was not alleged in Claims 3 through 5 of the Second Amended Petition.

In the post-conviction proceedings, Mitchell testified about his agreement with the prosecution:

> Mitchell admitted that he lied in his statement and when he testified at trial that the petitioner told him that he had to kill the victim because the victim saw his face. When asked why he lied, Mitchell responded that he was "scared, mad, [and] frustrated." Mitchell made his statement while the police were interrogating him, and he testified that the police told him that the petitioner "was downstairs ... putting [the crime] on [him]," which made him feel "[b]ad."

> Mitchell's court-appointed attorney spoke with the prosecutors in the petitioner's case twice. During a conversation with a prosecutor, Mitchell's attorney left the room after advising Mitchell to keep whatever he and the prosecutor discussed between them. Mitchell stated that the prosecutor offered him dismissal of the murder charge and less jail time if he would testify against the petitioner. Mitchell further stated that the prosecutors advised him that they were "going to try and get [the petitioner fifteen] years and give [Mitchell] four years." Mitchell again spoke with a prosecutor who offered him thirty years for the burglary charge and dismissal of the murder charge. Mitchell pleaded guilty to burglary, and the court sentenced him to thirty years. Mitchell stated that at the petitioner's trial he testified that the prosecution did not offer him any deals because he was "trying to protect" himself.

> . . .

> Mitchell stated that he did not kill the victim. He said that the petitioner was his cousin, and he felt bad about what happened and the petitioner getting the death penalty. He agreed that he lied about receiving a deal during the trial. When asked why he lied so much, Mitchell responded that he "was just trying to protect, save himself." Mitchell admitted that he was still trying to protect and save himself. According to Mitchell, the prosecutor with whom he made his deal "told [him] what to say," and Mitchell agreed that he went in front of the jury and "lied [his] little head off." He did not tell his attorney that the prosecutor told him how to testify and said that his attorney thought he was being truthful when he testified.

*Sims v. State*, No. W2008-02823-CCA-R3-PD, 2011 WL 334285, at *20, 22 (Tenn. Crim. App. Jan. 28, 2011).[7]

---

[7] Sims did not assert a *Brady,* false testimony, or prosecutorial misconduct claim related to Mitchell's testimony on appeal of the denial of post-conviction relief. The claims presented were ineffective assistance of counsel claims and general challenges to the constitutionality of the death penalty. *Sims*, 2011 WL 334285, at *52-71.

Sims has evidence from the post-conviction proceedings to support his allegations that the State withheld evidence that Mitchell had an incentive to testify against Sims, that Mitchell testified falsely, and that promises were made in exchange for his testimony. "*Brady* requires the State to turn over all material exculpatory and impeachment evidence to the defense." *Barton v. Warden, South. Ohio Corr. Fac.,* 786 F.3d 450, 468 (6th Cir. 2015). To the extent that the prosecution withheld material exculpatory or impeaching evidence, Sims could use that additional evidence to establish his *Brady* and false testimony claims and to excuse the procedural default of these claims. *See Jones v. Bagley*, 696 F.3d 475, 486-487 (6th Cir. 2012) ("[S]howing an actual *Brady* violation is itself sufficient to show cause and prejudice."). The District Attorney's file on Mitchell may provide evidence of a promise to Mitchell or an agreement the prosecution made with Mitchell, the offer of proof[8], and evidence about whether Mitchell was directed to testify in a certain manner. Sims has demonstrated good cause for discovery of the prosecution file on Brian Mitchell for the burglary and Smith's home and Smith's murder. Request 1 is GRANTED as limited.

### B.    Assistant District Attorneys' Depositions (Request 2)

Sims requests the deposition of Lee Coffee and James Lammey, the prosecutors on Sims' case. (ECF No. 69 at 1.) Coffee presented Mitchell's direct testimony and represented the State at Mitchell's plea proceeding. (ECF No. 70 at 17.) Sims asserts that, despite Coffee's acknowledgment in the post-conviction proceedings that Mitchell was given an incentive to testify, Coffee asserted at closing argument that Mitchell had no motivation to testify as a state witness. (*Id.*; *see* ECF No. 47-11 at PageID 3761-3762; *see also* ECF No. 46-15 at PageID 2109-2111.) Sims asserts that this irrefutable evidence establishes that the prosecution withheld

---

[8] *See* infra p.18.

exculpatory evidence, presented false testimony, and capitalized on that false testimony in its closing argument. (ECF No. 70 at 17.)

Respondent argues that Sims' request fails to establish good cause under Habeas Rule 6. (ECF No. 75 at 9.) Respondent asserts that conclusory allegations and speculative evidence is insufficient to warrant discovery in federal habeas proceedings. (*Id.* at 9.) He asserts that Sims' primary contention is that, since Mitchell was informed of the victim's family's expected presence at the trial, Mitchell was "'irrefutably' incentivized to testify falsely." (*Id.* at 10.) Respondent states that Mitchell had provided a written statement to police before testifying and before any alleged incentive was offered. (*Id.*) Respondent contends that Mitchell was extensively questioned about plea offers and agreements, and Mitchell denied that any offers or agreements were made. (*Id.*) Respondent notes that Mitchell denied that the State threatened him in relation to his testimony. (*Id.*) Respondent also states that Mitchell testified that Sims threatened to kill him in jail if he testified truthfully. (*Id.*)

Coffee testified in the post-conviction evidentiary hearing that Mitchell's counsel told him that Mitchell wanted to testify as a witness for the State and did not want to go to trial. (*Id.*; *see* ECF No. 47-11 at PageID 3760.) The expected offer of proof was discussed, and it was made "abundantly clear" to Mitchell that there would be no plea agreement or offer in exchange for his testimony. (ECF No. 75 at 11; *see* ECF No. 47-11 at PageID 3761.) Coffee was getting ready to set Mitchell's case for trial when he pled guilty. (*Id.* at PageID 3762-3763.) Respondent argues that Sims does no more than speculate about the existence of a nexus between the statement that the victim's family would be present at trial and an alleged plea agreement in exchange for false testimony. (ECF No. 75 at 11.)

Respondent contends that the request for the prosecutors' depositions is "a prohibited

'fishing expedition masked as discovery'" and that nothing Sims seeks in his request would develop or change the evidence presented. (*Id.*) Respondent argues that Sims fails to show the information he expects the prosecutors' depositions to uncover or what inquiries he intends to make. (*Id.*) Respondent asserts that Sims fails to state what elements of his *Brady*, *Giglio*, and prosecutorial claims would be supported by the depositions. (*Id.* at 11-12.) Respondent argues that Coffee has demonstrated he never told Mitchell to lie, that Coffee specifically instructed Mitchell that he would be indicted for perjury if he testified falsely, and that nothing suggests the requested depositions would demonstrate suppression of material evidence. (*Id.* at 12.)

Respondent argues that these claims are procedurally defaulted. (*Id.* at 12.) He asserts that Sims fails to establish how the depositions would demonstrate cause when the factual predicate of these claims were known and discoverable to defense counsel at the time of trial through due diligence. (*Id.*) Respondent contends that Sims cannot demonstrate prejudice where: (1) defense counsel substantially questioned Mitchell about inconsistencies between his testimony and his prior statement to police; and (2) defense counsel thoroughly questioned Mitchell about whether a plea agreement existed between him and the State in exchange for his testimony against Sims. (*Id.*)

Respondent asserts that, in the guilt stage closing argument, Coffee did not argue that Mitchell had no motivation to testify for the State, but that "Brian Mitchell doesn't have a deal with the State of Tennessee." (*Id.* at 12-13; *see* ECF No. 46-15 at PageID 2109-2110.) Respondent argues that the jury still would have convicted Sims given the evidence that: (1) his girlfriend saw the deep scar on his side and blood on his shirt when she treated the wound on his side because Sims refused to go to the hospital; (2) his beeper was found on the scene; (3) Smith was beaten severely with a rod-shaped object; and (4) Sims wrote a letter to Mitchell, after Sims'

arrest, admitting to the murder. (ECF No. 75 at 13.) Respondent argues that Sims cannot show prejudice from the prosecution's statement about a plea agreement with Mitchell given the evidence presented at trial. (*Id.*)

Sims contends that Respondent attempts to downplay the significance of the irrefutable evidence that the State told Mitchell that Smith's family would watch his trial testimony, and, if they were satisfied, the prosecution would recommend a disposition of the charges pending against Mitchell. (ECF No. 78 at 3.) Sims asserts that, while his trial counsel attempted to get Mitchell to admit that the prosecution gave him an incentive to testify, Sims' counsel had no extrinsic evidence to conduct the cross-examination. (*Id.* at 4.)

Sims argues that Respondent fails to mention that the prosecution also told Mitchell it would recommend disposition of his charges. (*Id.*) Sims contends that Coffee was preparing for Mitchell's trial because Mitchell believed the State failed to keep its side of the bargain by offering him a thirty-year sentence in plea negotiations, not because the State never offered Mitchell an incentive to testify. (*Id.*)

Sims further asserts that Coffee said *more to the jury* than Mitchell does not have a deal with the State. (*Id.* at 4.) Coffee said,

the only deal he has is that he's going to go to the penitentiary for his participation in this crime. That's the only deal that Brian Keith Mitchell has …. He has no motivation to come to court and lie to you. . . .

(*Id.*)

Sims argues that, while Respondent believes that other evidence renders the prosecution's "deceptive dealings with Mitchell inconsequential, the other evidence [Respondent] inventories supports only a finding that the victim died when he and Mr. Sims struggled over a gun." (*Id.* at 4-5.) Sims challenges the basis on which the prosecution persuaded the jury to find him guilty of

premeditated murder and sentenced to death. (*Id.* at 5.) He contends that the "saw his face" testimony was the "sole support" for a determination that Sims was guilty of premeditated murder. (*Id.*) Sims argues,

> Given the singular importance of Mitchell's testimony, Mr. Sims presents viable claims that the State violated due process when it withheld evidence about the incentive it gave Mitchell for his trial testimony, presented Mitchell's false testimony that no such incentive existed, and capitalized on that false testimony during closing argument.

(*Id.* at 5.) Sims asserts that he cannot provide an exhaustive description of the testimony he expects to obtain at the prosecutors' depositions because the State has withheld evidence on the topics that testimony will cover. (*Id.*)

The state court record contains evidence about the promises or consideration given to Mitchell in exchange for his testimony. Coffee is African-American, and Lammey is Caucasian. (ECF No. 47-1 at PageID 2934.) Mitchell testified that one of the prosecutors was white and one was black, and they told him they would give him less time and drop the murder charges for testifying against Sims. (ECF No. 47-8 at PageID 3375-3376.) The second time Mitchell met with only one prosecutor, the black prosecutor. (*Id.* at PageID 3377.) Mitchell said the black prosecutor said he was giving Mitchell 30 years for the burglary charge and dropping the murder charge. (*Id.*)

Coffee testified in the post-conviction proceedings about Mitchell's testimony, plea, and sentence. (ECF No. 47-11 at PageID 3760-3769.) Sims' counsel's prior opportunity to cross-examine a witness generally mitigates the need for a discovery deposition. *See Payne*, 89 F. Supp. 2d at 974. Sims has not demonstrated why Coffee's deposition is now needed, especially given Coffee's post-conviction testimony. Sims makes no specific assertions about why Lammey's testimony is needed to support his claims.

Sims has not outlined the evidence that he seeks from the prosecutors. Although Sims may not be able to provide an exhaustive description of the information he seeks, he could provide the Court with categories of information he seeks to cover in the depositions. An unlimited deposition of the prosecution would amount to a fishing expedition. Sims has not demonstrated good cause for the depositions of Assistant District Attorneys Coffee and Lammey. Request 2 is DENIED.

### C. Memphis Police Officers' Depositions (Request 3)

Sims requests the depositions of Memphis Police Officers J. W. Bouchillon, E. E. Cash, Donald Crowe, C. E. Logan, and James Nichols. (ECF No. 69 at 1.)

#### 1. Cash and Nichols

Memphis Police Officers E.E. Cash and James Nichols interrogated Brian Mitchell upon his arrest. (ECF No. 70 at 18-19.) Mitchell initially told police that Sims "went back inside to get the key from the white man to move the vehicle so that they could leave and that is how the white man got shot and killed." (*Id.* at 19; *see* ECF No. 70-3 at PageID 5989.) However, Sims contends that, after hours of interrogation, the officers took Mitchell's statement that Sims shot Smith because he "saw our face and he had to kill him." (ECF No. 70 at 1; *see* ECF No. 70-4 at PageID 5995.) Sims asserts that the police believed that Smith was shot in the head, face and neck, and that Mitchell's statement reflects that belief, when actually Smith was shot once with "a tangential wound" to the side of his head and beaten with a rod-shaped object. (ECF No. 70 at 19-20.)[9] Sims asserts that these discrepancies provide reason to believe that police induced Mitchell to repeat the story that Smith was shot repeatedly because he saw Sims' face. (*Id.* at

---

[9] Steven Symes, a forensic anthropologist, described Smith's wound as "a tangential gun shot wound." (ECF No. 70-12 at PageID 6038.) He does not use the term "tangential" in his testimony. He describes a wound having an entrance projectile that impacts the bone at an angle. (*See* ECF No. 46-15 at PageID 2029-2030.)

20.)

Respondent argues that Sims does not establish good cause for deposing these officers. (ECF No. 75 at 14, 16.) Respondent asserts that there is no credible evidence to suggest that Mitchell fabricated his story or that the prosecutors or law enforcement acted improperly. (*Id.* at 15.) Respondent asserts that Mitchell testified to hearing eight or nine gunshots fired, and at least five fired .380 cartridges were recovered. *State v. Sims*, No. W1998-00634-CCA-R3-DD, 2000 WL 298901, at *3 (Tenn. Crim. App. Mar. 14, 2000). (*Id.*) Respondent argues that Sims failed to mention that the forensic pathologist initially thought some of Smith's wounds were gunshot wounds because of the severity and placement of these wounds and only later determined that just two of the wounds were the result of the bullet entering and fragments of the bullet exiting the skull. (*Id.*; *see* ECF No. 46-14 at PageID 1981-1984.) Respondent asserts that the combination of the severe beating and the gunshot wound killed Smith. (ECF No. 75 at 15-16.) He argues that this combination of beating and shooting demonstrates a clear intent to kill Smith. (*Id.* at 16.) Respondent asserts that the request to depose Cash and Nichols on the basis that they induced Mitchell to fabricate a story is wholly speculative. (*Id.*)

Sims argues that Respondent fails to grasp the significance of Mitchell's second statement to law enforcement that Sims said he shot the victim in his head, face, and neck. (ECF No. 78 at 6.) Sims contends that the autopsy established that Mitchell's police statement is false and calls into question how Mitchell came to endorse a false version of the facts. (*Id.*) Sims argues that the pathologist's misperception of the wounds underscores how similar the wounds are to gunshot wounds. (*Id.* at 6 n.1.)

Mitchell's testimony is at issue. Mitchell testified that Sims told him how Smith was shot:

He had told me him and the man had [struggled] . . . they was [struggling] over the gun and he got shot – he had -- the man shot him in the side and he was [struggling] over the gun. And the man had got shot in the head and neck.

. . .

He had told me he shot him about two times.

. . .

Yeah, he told – he had told me they – they was – when they [struggling] – [struggling] over the gun, he had – he had hit the – he had hit the man – hit the – they were they was [struggling] to get the key. I guess they was fighting . . . I guess when he had shot Vince Sims, they struggled, they was fighting, I guess.

. . .

He had told me they was [struggling] over the gun, and he just got shot in the head and the neck.

(ECF No. 46-14 at PageID 1868-1869.)

At trial, Mitchell was questioned about the statement he gave to Cash and Nichols. (*Id.* at PageID 1870.) He was also questioned about a letter he received from Sims. (*Id.* at PageID 1877-1880.) Mitchell testified he was not in the house when the alleged wrestling and scuffling over the gun occurred and that he did not know exactly how Smith was shot. (*Id.* at PageID 1880-1881.)

Mitchell testified on cross-examination that he had been in jail for a full day before he gave his statement. (*Id.* at PageID 1889-1890; *see id.* at PageID 1913-1915.)[10] He stated that there were inaccuracies in the police statement and that he could not read well. (*Id.* at PageID 1907-1909.) On re-direct, Mitchell testified that Sims said "he shot the man in the head and the neck . . . he had shot the man because he saw his face . . . ." (*Id.* at PageID 1921.)

_____

[10] Mitchell was arrested at 3:30 p.m. on April 9, 1996, and his statement was taken at 8:07 p.m. on the same day. (ECF No. 70-1 at PageID 5984-5985; *see* ECF No. 70-4 at PageID 5991.)

Mitchell testified at the post-conviction evidentiary hearing. (*See* ECF No. 47-8 at PageID 3355.) He said that Sims never told him he had to kill Smith because he saw his face. (*Id.* at PageID 3372-3373.) Mitchell said he lied because he "was scared, mad, frustrated" because the police told him that Sims was downstairs "putting it on me . . . trying to make me look like what he did I did." (*Id.* at PageID 3373.)[11]

Sims argues that his request for discovery will provide evidentiary support for the following issues: (1) that Smith was shot only once versus multiple times; and (2) that Sims told Mitchell he shot Smith because he saw Sims' face. Mitchell has admitted that:

- he lied when he claimed that Sims told him he killed Smith because Smith saw his face;

- Mitchell was not in the house when Smith was shot; and

- Mitchell did not know how the shooting occurred.

Mitchell did not say that he lied at trial about other aspects of the crime.

Mitchell and Sims are the only people who know what happened. Mitchell has a credibility issue because he recanted some of his testimony. Sims has a credibility issue because of his interest in the outcome and because he has not been honest about his involvement in this crime, first blaming Mitchell for shooting Smith.

Cash and Nichols do not know what happened. They can only provide information about the investigation and interrogation. Sims did not allege police misconduct related to the interrogation in the Second Amended Petition. Mitchell's post-conviction testimony does not indicate that the police encouraged or induced him to make any specific statement about the

---

[11] The report from Cash and Nichols from Sims' interview indicates that Sims told officers that Mitchell stated "let's pull a caper," that he forced the front door of Smith's house open, and that Mitchell shot Smith while Sims crawled to the car. (ECF No. 70-3 at PageID 5988-5989.)

crime.

Cash and Nichols' testimony will not resolve the issue of the falsity of Mitchell's testimony. Mitchell attributes his lying at trial and during the statement to being scared, mad, and frustrated.

Sims does not outline the information he seeks from Cash and Nichols or how that information will support his claims. Sims has not demonstrated good cause for the depositions of Cash and Nichols.

### 2. Crowe and Bouchillon

Sims contends that a central issue in this case is whether Smith died over a struggle for a gun or whether Sims executed Smith because Smith "saw his face." (ECF No. 70 at 20.) Sims contends that the Homicide Bureau Report supports the version of the events where Smith went into the house, retrieved a .380 pistol from a dresser, and died after being shot with that pistol during a struggle with Sims. (*Id.* at 20-21; *see* ECF No. 70-1 at PageID 5985.) Sims contends that the only possible source of this information was Smith, who was alive when his girlfriend Patricia Henson and the initial police officers arrived at the scene. (ECF No. 70 at 21.) Sims seeks the deposition of Officers Donald Crowe and J.W. Bouchillon because they were the initial responding officers on the scene. (*Id.*) He contends that their depositions will assist with developing potential evidence that Smith or Henson told Crowe or Bouchillon that Smith was shot during a struggle over his .380 pistol. (*Id.*)[12]

Respondent argues that Sims requests these depositions on the basis that Smith was shot

_____

[12] Henson testified that Smith kept saying "Call 911, help me, call 911" and that she asked what happened "[a]nd one time he looked straight up into my face and said, "Robbery." That was the only thing he ever said except for, "Help me, call 911". (ECF No. 46-12 at PageID 1668; *see also* Officers Field Notes, ECF No. 70-6 at PageID 6002 ("Ms. Henson stated she did not know what happened.")

with his own .380 pistol.  (ECF No. 75 at 16).  Respondent asserts that the requests ignore the evidence that clearly shows that the bullet removed from Smith's brain was a .22 caliber bullet and that the police recovered fragments from three or four .22 caliber bullets at the crime scene. (*Id.*)  Respondent notes Mitchell's testimony that Sims returned to the car with a chrome pistol, presumably the .380 that was never recovered.  (*Id.*)[13]  Respondent argues that Sims fails to make any connection between these facts and the request for the depositions of Crowe and Bouchillon or explain how the depositions would support his claims.  (*Id.*)

Sims asserts that Respondent fails to grasp the significance of Mitchell's second statement to law enforcement in which he claimed that Sims said he shot the victim "in his head, and in the face, and the neck."  (ECF No. 78 at 6.)  Sims asserts that a single "tangential" gunshot wound is not consistent with the mistaken belief that Sims repeatedly shot Smith or that Sims shot Smith because Smith saw his face.  (*Id.*)  Sims contends that the wound is consistent with the assertion that Smith was shot during a struggle over a gun.  (*Id.* at 6-7.)

Sims asserts that Respondent fails to recognize that police created the arrest report at the conclusion of the investigation, after all of the evidence including the autopsy had been collected and analyzed.  (*Id.* at 7.)  Sims asserts that, after the autopsy, police believed that Smith was shot with his own gun.  (*Id.*)  Sims argues that this belief is inconsistent with trial testimony and highlights why he is entitled to discovery.  (*Id.*)  He contends that Crowe and Bouchillon may possess information shedding light on how the police concluded that Smith was shot with his

---

[13] Smith's .380 pistol was supposedly not recovered, and it was reported that Sims took the gun from the house.  Henson testified that one of Smith's guns was missing, the one from the dresser drawer in the bedroom.  (ECF No. 46-12 at PageID 1671-1672.)  There is a second reference to a .380 pistol in the police narrative that "A Raven .380 caliber semi-automatic chrome with a magazine of five live rounds, serial number 1167363, was recovered out of a desk drawer, located in the first bedroom on the west side of the hall."  (*See* ECF No. 70-5 at PageID 5999; *see also* ECF No. 46-13 at PageID 1769.)

own gun, a conclusion that was abandoned at trial. (*Id.*)

The two-page Homicide Bureau Report is not the comprehensive, conclusive investigative report that Sims portrays it to be. Officer Charles ("C E") Logan submitted the report which is based, in part, on information provided by MPD Officers Donald Crowe and Jerry McCullough. (*See* ECF No. 70-1 at PageID 5985.) The report includes the arrest report and information supporting a finding of probable cause, and it refers to supplements and statement for details of the investigation. (*See* ECF No. 70-1 at PageID 5984-5985.) There is no reference to the evidence taken from the crime scene or to the autopsy report.

The Homicide Bureau Report states that Smith entered the house, went to a rear bedroom without being noticed by the intruders, and retrieved a .380 pistol from a dresser. (*See* ECF No. 70-1 at PageID 5985.) Sims contends that Smith is the only possible source of this information. However, Sims told police that Mitchell got into a scuffle with Smith in his statement on April 9, 1996. (ECF No. 46-3 at PageID 710.) Sims also described a scuffle in the letter he gave to Mitchell

> The homeowner returned home and observed an unknown vehicle parked in his drive 1994 Maroon Toyota Camry 4-dr TN 241-FW2. The homeowner pulled his vehicle in behind suspects['] vehicle blocking them in[.] Homeowner then entered his residence[,] went to a rear bedroom without being noticed by the two burglars[,] and retrieved a 380 pistol from a dresser draw[er] and then confronted intruders with the 380 pistol[. B]rian ran out of residence and I out of the residence[. T]hat's when home owner began shooting several shots at Vincent Sims grazing him in the right side and [l]eft hip. That's when Vincent tried to stop the homeowner from killing him and a scuffle and struggle ensued between Vincent Sims and homeowner[. T]he end results were that the home owner Mr. Forrest Smith was shot once in the head with his .380 pistol. Vincent Sims then picked up the homeowner 380 pistol and keys and fled the scene with Brian K. Mitchell in a maroon Toyota Camry. No property was taken from the scene.

(ECF No. 46-4 at PageID 744-745.)

Crowe testified at trial. (ECF No. 46-12 at PageID 1676-1689.) He thought Smith had

been shot, but he could not tell how many times. (*Id.* at PageID 1679-1680.) Crowe believed that Smith was shot more than once "because there w[ere] little puddles of blood forming at different spots." (*Id.* at PageID 1680.) Smith responded to Crowe's questions stating twice, "They shot me in the head." (*Id.* at PageID 1680, 1685.) Smith, before he lost consciousness, stated that he did not know who shot him. (*Id.* at PageID 1680.) There was no mention of the .380 pistol or a struggle with the robbers.

Bouchillon did not testify at trial. His report describes the location of .380 casings in the house. (*See* ECF No. 70-2 at PageID 5986.) There is no information about Smith or a struggle with Sims over the .380 pistol in this report.

The State presented the jury with evidence about a struggle through Mitchell's testimony. (ECF No. 46-14 at PageID 1868-1869, 1880.) Sims cannot contend that evidence of a struggle was withheld because he knew of and presented the theory that Smith was shot during a struggle in his statement to police and the letter he gave to Mitchell. (*See* ECF No. 46-3 at PageID 710; 744-75.). Even if Crowe and Bouchillon's testimony could shed light on whether Smith was in a struggle with Sims, that information is not likely to demonstrate a due process violation based on withheld evidence, false testimony, or prosecutorial misconduct. Additionally, the argument that Smith was shot with his own gun is disputed by the forensic evidence that he was shot with a .22 caliber pistol.

Sims has not indicated how Crowe or Bouchillon's testimony will develop his claims. Sims has not demonstrated good cause for the depositions of Crowe and Bouchillon.

### 3. Logan

Sims asserts that he presents claims that the prosecution withheld evidence supporting the finding that Smith was shot with his own gun, presented false testimony precluding this finding,

and misinformed the jury that Sims carried a .22 caliber pistol into Smith's house and killed Smith.  (ECF No. 70 at 22.)  Sims contends that the Homicide Bureau Report filed by Officer C.E. Logan supports Sims' assertion that "[t]he weapon used in this homicide, a .380 automatic pistol, wasn't recovered."  (*Id.*; *see* ECF No. 70-1 at PageID 5984.)  Logan wrote that: (1) Smith came home while Mitchell and Sims were burglarizing the house; (2) Smith went inside the house and got his pistol; (3) a scuffle ensued; and (4) investigators believe that Smith was shot once in the head with his .380 pistol.  (ECF No. 70 at 22-23; *see* ECF No. 78 at 7.)  Sims argues that the report conflicts with TBI Agent Don Carmen's trial testimony, presumably about the .22 caliber bullet fragment that he received from the hospital after Smith's death.  (ECF No. 70 at 23; *see* ECF No. 46-14 at PageID 1943.)[14]  Sims seeks to depose Logan because he authored the Homicide Bureau Report.  (ECF No. 70 at 23.)

Respondent argues that Sims' request for Logan's deposition fails to establish good cause because Sims does not identify the allegedly contradictory false testimony at issue and fails to present a sufficient factual basis for the deposition.  (ECF No. 75 at 19.)  Respondent asserts that Logan's report does not mention the autopsy or the bullet fragments taken from Smith's body.  (*Id.* at 19-20.)  Respondent argues that the report clearly states that the findings are the result of: (1) Mitchell's statement; (2) Sims' statement; (3) Dr. Gunther's April 6, 1996 statement; and (4) Patricia Henson's written statement.  (*Id.* at 19-20.)  Respondent contends that each essential fact in the report was supported by evidence at Sims' trial.  (*Id.*)

Respondent argues that Sims' factual basis for the request is that the investigators initially believed Smith was shot and killed with a .380 caliber bullet because the report states

---

[14] TBI Agent Carmen specializes in forensic firearm identification.  (ECF No. 46-14 at PageID 1936.)

that Smith "was beaten, stomped, kicked, and shot once in the head, with what investigators believe to be his .380 pistol that was taken from him by the intruders." (*Id.* at 20.) Respondent asserts that the proof at trial indisputably shows that Smith was shot with a .22 caliber bullet. (*Id.*) Therefore, Sims' request constitutes a prohibited fishing expedition. (*Id.*) Respondent further argues that Sims makes no effort to establish how the requested discovery proves his claims or establishes cause and prejudice to overcome procedural default. (*Id.*)

Sims argues that Respondent's invocation of procedural default supports his entitlement to discovery. (ECF No. 78 at 7.) Sims contends that the Court should allow him an opportunity to conduct discovery before making a final default determination. (*Id.*)

Although record evidence clearly indicates that a .380 caliber weapon was fired on the scene, no evidence was presented at trial or has otherwise surfaced that indicates Smith was shot with a .380 caliber weapon. Logan's report was based on information from other sources including Mitchell's and Sims' statements which address the theory that Smith was shot during a struggle. Logan would not have first-hand knowledge of what happened. His report is not evidence.

Sims has not stated specifically what information he seeks to obtain from Logan in a deposition. The request is overbroad and not tailored to obtain relevant information to support the claims at issue. Sims has not demonstrated good cause for Logan's deposition.

Request 3 for the deposition of police officers Cash, Nichols, Crowe, Bouchillon, and Logan is DENIED.

### D.    TBI Documents (Request 4)

Sims requests discovery of documents the TBI obtained, reviewed, and/or created respecting tests the TBI performed on crime scene evidence. (ECF No. 70 at 23.) He combines

this request with the request for Logan's deposition. (*Id.* at 21.) Sims asserts that the conflicts between the Homicide Bureau Report and Carmen's trial testimony create a reason to believe that the TBI has exculpatory evidence about the bullet fragment taken from the victim's head. (*Id.* at 23.) Sims contends that the TBI may have evidence to support his false testimony claim about Sims carrying a .22 caliber pistol in the house. (*Id.*) Sims therefore seeks the TBI documents respecting forensic tests. (*Id.*)

Respondent makes the same argument in opposition to the request for TBI files as he did in opposition to Logan's deposition. (*See* ECF No. 75 at 19-21.)

TBI Agent Carmen has testified about the .22 caliber bullets that he received. The TBI would have no knowledge about whether Sims was carrying a .22 caliber pistol that night. To the extent Sims contends that evidence about a .22 caliber bullet fragments was planted, the TBI would have no knowledge of what evidence was collected or planted at the crime scene only about the testing of evidence that they received. Even the absence of evidence about a .22 caliber pistol does not resolve the issue of Mitchell's false testimony. Sims has not demonstrated how documents related to the TBI's testing of the crime scene evidence would support his claims. Sims has not demonstrated good cause for TBI documents. Request 4 is DENIED.

### E. Memphis Police Department Crime Scene File (Request 5)

Sims seeks discovery of a Memphis Police Department crime scene file currently in the possession of Karon Corbitt. (ECF No. 70 at 23-24.)[15] Sims asserts that the .22 caliber bullet fragments taken from the crime scene do not appear on the crime scene diagram. (*Id.* at 23.) He contends that Officers George Coleman and Amos Corbitt claimed they collected the fragments

---

[15] Sims asserts that Memphis Police Crime Scene Officer Amos Corbitt is deceased, but Karon Corbitt maintains his MPD crime scene files. (ECF No. 70 at 24 n.74.)

after Officer R.W. Weedle, who created the crime scene diagram, completed his work.  (*Id.* at 23-24.)  Sims contends that the materialization of evidence that was not included in the crime scene diagram supports his assertions of withheld evidence and prosecutorial misconduct about the .22 caliber pistol.  (*Id.* at 24.)

Respondent argues that Sims' assertion that Weedle's initial crime scene sketch establishes a sufficient factual basis to assert that the prosecution planted false evidence in the form of .22 bullet fragments the night of the murder is not supported in the record.  (ECF No. 75 at 21.)  Respondent points out that Officer Coleman was Weedle's partner, and Coleman remained on the scene after Weedle was called away.  (*Id.* at 21-22.)  Coleman found the fragments and tagged them as evidence.  (*Id.* at 22.)  Respondent notes that the state court has made a factual finding that the bullet removed from Smith was a .22 caliber bullet.  (*Id.*)  Respondent argues that this request is "plainly a fishing expedition" and that Sims does not connect this request to the elements of his claims.  (*Id.*)

Agent Carmen identified the items in Exhibit 17 as three .22 caliber bullet fragments.  (ECF No. 46-14 at PageID 1942.)  Coleman testified at trial that he was a crime scene officer that worked with Officer Weddle[16] that night.  (ECF No. 46-13 at PageID 1764.)  Coleman assisted Weddle with a sketch of the inside of the house.  (*Id.* at PageID 1764-1765.)  Coleman testified that Weddle left the scene to go on another call because they were "short of officers that night", but Coleman remained.  (*Id.* at PageID 1765, 1770.)  Coleman testified that he found the bullet fragments and made a notation for his report.  (*Id.* at PageID 1770, 1776-1777.)  Coleman did not have any one to help him measure the location of these fragments, so they were not put on the sketch.  (*Id.* at PageID 1770.)

---

[16] The officer's name is spelled "Weedle" in Sims' memorandum and "Weddle in the transcript.

Corbitt testified at trial that he arrived on the scene with Officer Sides. (ECF No. 46-14 at PageID 1929-1930.) He testified that he located the bullet fragment at Exhibit 19 and tagged it into evidence. (*Id.* at PageID 1930-1931.) Carmen identified Exhibit 19 as a .22 caliber lead bullet. (*See* ECF No. 46-14 at PageID 1945.)

The testimony at trial indicates that there were .22 caliber bullets and fragments on the crime scene and that the bullet removed from Smith was a .22 caliber bullet. (*See id.* at PageID 1942-1946.) Crime scene officers testified about who was on the scene, the reason for Officer Weddle leaving, and the nature of the crime scene investigation. Although Sims asserts that the .22 caliber bullets were planted, he has not explained the .22 caliber bullet retrieved from Smith's body. Sims has not demonstrated how the information in Corbitt's file would support his claim when Sims has admitted to shooting Smith during the burglary, and the only bullet recovered from Smith's body was a .22 caliber bullet. Sims has not demonstrated good cause for Corbitt's crime scene file.

Request 5 is DENIED.

## VI.  CONCLUSION

Request 1 is **GRANTED**, as limited *supra*. Requests 2, 3, 4, and 5 are **DENIED**. Petitioner shall have 90 days from the entry of this order to complete discovery.

IT IS SO ORDERED, this 6th day of May 2016.


**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE