**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| VINCENT SIMS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )   Case No. 2:11-cv-02946-JTF-cgc |
| | ) |
| TONY MAYS, Warden, | ) |
| | ) |
| Respondent. | ) |

**ORDER DENYING PETITIONER'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Before the Court is the Petitioner's Motion for Partial Summary Judgment (ECF No. 96); the Response to Petitioner's Statement of Undisputed Material Facts in Support of His Motion for Partial Summary Judgment (ECF No. 107); the Warden's Response in Opposition to Petitioner's Motion for Partial Summary Judgment (ECF No. 108); and Petitioner's Reply to Response in Opposition to Petitioner's Motion for Partial Summary Judgment (ECF No. 118). The Petitioner's Motion for Partial Summary Judgment (ECF No. 96) is DENIED because Petitioner has not overcome the procedural default of the claims at issue.

## I.    CLAIMS AT ISSUE

Sims seeks merits review and summary judgment on his claims that:

1. the State withheld evidence about an arrangement that Sims's codefendant Brian Mitchell[1] had with the prosecution in exchange for his testimony at Sims's trial (*see* Claim 3, Second Amended Petition ¶¶ 208.7, 208.8-208.8.12/140, 178, ECF No. 45 at PageID 499–500) ;

---

[1] Mitchell is Sims's cousin.  (ECF No. 46-14 at PageID 1849.)  Mitchell was a juvenile at the time of the crime.  (*Id.* at PageID 1848.)

2.  the State allowed Mitchell's false testimony that there was no bargain for his testimony (*see* Claim 4, ¶¶ 212.8 - 212.12/140, 145.8.3-145.8.7, *id.* at PageID 502-03); and

3.  the State vouched for Mitchell in its closing argument by stating he was not motivated to lie (*see* Claim 5, ¶¶ 220/149.4, *id.* at PageID 504).

(*See* ECF No. 96 at PageID 6181-82.)

## A. WITHHELD EVIDENCE (CLAIM 3)

In Claim 3, Sims alleges that the State withheld exculpatory or impeaching evidence or information that:

> prior to trial, prosecutor Lee Coffee told Mitchell that after he testified in Mr. Sims's case, if the case concluded in a manner satisfactory to the prosecution, the State would:
>
> 208.7.1. Go over Mr. Mitchell's testimony with Forrest Smith's family members;
>
> 208.7.2. Have the family members evaluate that testimony; and
>
> 208.7.3. Thereafter make a recommendation about a possible disposition of the charges pending against Mitchell; *see* Paragraph 140, 178.

(*See* ECF No. 45 at PageID 469, 499.)

Sims alleges that the State withheld evidence and/or information that Mitchell was lying when he testified that:

> 208.8.8. Nobody had made him any deals or threatened him in order for him to testify;
>
> 208.8.9. He expected to face the full range of punishment at his subsequent trial;
>
> 208.8.10 He didn't expect any bargain for his testimony;
>
> 208.8.11. No one advised him that in return for his testimony the first degree murder charge against him might be reduced;
>
> 208.8.12. He did not even know whether it was a possibility that in return

2

for his testimony the first-degree murder charge against him might be reduced.
(*See* ¶¶ 145.8.3–145.8.7, 208.8.8-208.8.12, *id.* at PageID 473, 499–500.)

Sims argues that the State gave Mitchell an incentive to testify, and the Fourteenth Amendment requires the State to disclose that incentive, whether an express bargain or not, to the defendant. (ECF No. 96-1 at PageID 6191–92.) Sims asserts that, before trial, the prosecution told Mitchell that it would go over his testimony with the victim's family and determine what plea bargain terms to offer Mitchell. (*Id.* at PageID 6192.) Sims argues that the prosecution let Mitchell know it was available to help with his pending charges and the extent of help depended on its satisfaction with Mitchell's testimony. (*Id.*)

In support of Claim 3, Sims asserts that, on or around September 15, 1998, Coffee and Assistant District Attorney Lammey wrote an interoffice memo (*see* ECF No. 96-5 at PageID 6258) discussing the considerations that led to a recommendation that the State drop the murder charge against Mitchell and that Mitchell receive a thirty-year sentence at Range I for especially aggravated burglary. (*See* ECF No. 96-1 at PageID 6188; *see* ¶ 178, ECF No. 45 at PageID 480–81.) Sims alleges that the memorandum states, "[b]ased in large part on Mitchell's testimony, the jury convicted Sims on premeditated murder and sentenced Sims to die." (*See* ¶ 178.1, *id.* at PageID 481.) The testimony was described as "crucial" to obtaining the death sentence, which "[w]e could not have gotten . . . without Mitchell's truthful cooperation." (*See* ¶¶ 178.2–178.3, *id.*)

### B.  FALSE TESTIMONY (CLAIM 4)

Sims seeks summary judgment on his false testimony claims in Claim 4 that the prosecution presented and/or condoned false testimony when Mitchell falsely told jurors that:

3

(a) nobody had made him any deals or threatened him in order for him to testify (*see* Second Amended Petition ¶¶ 140, 145.8.3, 212.8);

(b) he expected to face the full range of punishment at his subsequent trial (*see id.*, ¶¶ 140, 145.8.4, 212.9);

(c) he didn't expect any bargain for his testimony (*see id.*, ¶¶ 140, 145.8.5, 212.10);

(d) No one advised him that in return for his testimony the first-degree murder charge against him might be reduced (*see id.*, ¶¶ 140, 145.8.6, 212.11); and

(e) He did not even know whether it was a possibility that in return for his testimony the first-degree murder charge against him might be reduced. (*see id.*, ¶¶ 140, 145.8.7, 212.12).

(ECF No. 45 at PageID 502–503; *see id.* at PageID 469, 473.)

Sims argues that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with the rudimentary demands of justice. (ECF No. 96-1 at PageID 6188–89.) Sims argues that Mitchell testified on direct examination that the prosecution had not given him a promise or deal for this testimony. (ECF No. 96-1 at PageID 6190.) On cross-examination, Mitchell testified that he expected to go to trial and face the full range of punishment, did not expect a plea bargain, and did not know if the charges against him could be reduced. (*Id.*) Sims argues that, before trial, the prosecution told Mitchell that they were going to review his trial testimony with the victim's family and decide afterwards the terms for his plea bargain. (*Id.*) Sims asserts that, at trial, the prosecution knew that Mitchell's testimony was false. (*Id.*)

## C. PROSECUTORIAL MISCONDUCT (CLAIM 5)

Sims seeks summary judgment on his prosecutorial misconduct claim that, in closing argument at the guilt stage, Coffee misinformed jurors when he told them: (1). "I don't make deals with criminals;" and (2) Mitchell had no motivation to testify for the State. (*See* ¶¶ 220, ECF No. 45 at PageID 504.) Sims contends that Coffee argued,

4

> I don't make deals with criminals. I don't make deals with killers. Brian Mitchell doesn't have a deal with the State of Tennessee. (Mitchell) has no motivation to put his life on the line and come here and lie to you. He took the stand and told you the truth because he felt that was the best thing for him to do. (Mitchell) had the courage, he had the common decency to come to court and take responsibility for what he did and to tell you what that man did.

(*See* ¶ 149.4, *id.* at PageID 475.)   ¶

Sims contends that the prosecutor misled the jury at closing argument and chose to reinforce Mitchell's known false testimony.   (ECF No. 96-1 at PageID 6190.)   Sims argues that the prosecutor threw the weight of his credibility behind a known falsehood as he manipulated and misstated evidence, and by doing so, he infected the trial with an unfairness that the Fourteenth Amendment does not tolerate.   (*Id.*)   Sims contends that the prosecution knew that Mitchell's "no bargain" testimony was false and vouched for him by telling the jury that he had no reason to lie. (*Id.* at PageID 6190–91.)

## II.   BACKGROUND

In May 1998, Sims was convicted of especially aggravated burglary of Forrest Smith's home and first-degree premeditated murder for Smith's subsequent death.   *Sims v. State*, No. W2014-00166-CCA-R3-PD, 2014 WL 7334202, at *1 (Tenn. Crim. App. Dec. 23, 2014).   Sims received consecutive sentences of 25 years for especially aggravated burglary and the death penalty for first-degree premeditated murder.   *Id.*

### A.   GUILT PHASE EVIDENCE

The Tennessee Court of Criminal Appeals summarized the guilt phase evidence as follows:

On April 5, 1996, Forrest Smith arrived home from work around 10:00 p.m. He found the [Petitioner], Vincent Sims, and Sims's [teenage] cousin, Brian Mitchell, in the process of burglarizing his home. Mitchell testified that Sims had called him earlier in the evening asking for help in moving a big screen television from a house Sims had burglarized. Sims picked up Mitchell in a borrowed Toyota Camry

5

belonging to Sims's girlfriend. They drove to Smith's house, parked the car under the carport, and loaded the big screen television in the trunk. Sims and Mitchell were in the house disconnecting a computer when Smith arrived. Smith parked his Jeep in the driveway to block the other vehicle's exit. When Smith entered the house, Sims and Mitchell ran outside but were unable to get the Camry out of the driveway. Sims went back into the house while Mitchell remained outside.

Mitchell testified that he heard Sims yelling at Smith to give Sims the keys to the Jeep. Mitchell then heard eight or nine gunshots fired inside the house. Sims returned carrying Smith's .380 caliber chrome pistol and the keys to the Jeep. Sims was holding his side and told Mitchell that he had been shot. Sims threw Mitchell the keys to move the Jeep, and the two fled the scene in the Camry. Mitchell testified that Sims told him that Sims and Smith had fought over the .380 caliber pistol and that Sims had shot Smith. Sims told Mitchell that Sims had to kill Smith because Smith had seen Sims's face. Sims instructed Mitchell not to talk to anyone about what had happened and later threatened Mitchell's life after they were in custody.

Smith's girlfriend, Patricia Henson, arrived at the home shortly after the shooting, sometime between 10:00 and 10:30 p.m. Smith was lying on the kitchen floor in a pool of blood, but he was conscious and asked Henson to call 911. When asked what had happened, Smith was able to tell Henson and Officer Donald Crowe that there had been a robbery and that Smith had been shot in the head. Officer Crowe testified that Smith was bleeding from several parts of his body, appeared to have been shot more than once, and was in severe pain. After receiving treatment by paramedics on the scene, Smith was transported to the hospital. He died approximately four and a half hours later.

In the meantime, Sims took Mitchell home and picked up Sims's girlfriend, Tiffany Maxwell, from work after she clocked out at 11:05 p.m. Maxwell testified that Sims was visibly upset and had blood on his shirt. Upon inquiry, Sims told her that someone had attempted to rob him. Maxwell also noticed that he had a "deep scar" injury on his side, which she treated herself after Sims refused to go to the hospital. The following morning, Sims and Maxwell took Maxwell's car to be washed and detailed. Maxwell then noticed that the license plate frame on her car was broken. Sims and Maxwell attended an Easter Sunday church service the next morning. According to Maxwell, Sims behaved normally with nothing unusual occurring until the following Tuesday when Sims was arrested at Maxwell's place of employment.

After Sims and Mitchell were in custody, Sims gave Mitchell a letter to deliver to Mitchell's attorney. In that letter, Sims recalled the events surrounding the burglary and murder. Sims alleged that Smith had fired at Sims and Mitchell as they fled the house. Mitchell testified that this portion of the letter was untrue. Mitchell

maintained that no shots were fired until Sims went back inside the house to get Smith's keys to the Jeep. Sims also contended in the letter that Smith was accidentally shot in the head while the two struggled over the .380 caliber pistol.

Significantly, however, the bullet removed from Smith's brain was a .22 caliber bullet. The police also recovered fragments from three or four .22 caliber bullets at the scene. Mitchell testified that he had seen Sims with a long barrel .22 caliber revolver with a brown handle earlier in the evening. Although Mitchell did not see Sims with the revolver during the burglary, he did see something protruding under Sims's shirt. In addition to the .22 caliber bullets, the police found a bullet fragment from a probable .380 caliber bullet and five fired .380 caliber cartridge cases at the scene. Officers also recovered from Smith's carport a beeper that was later identified as belonging to Sims and the broken license plate frame from Maxwell's car.

Forensic pathologist Wendy Gunther performed the autopsy on Smith. She testified that Smith suffered a gunshot entry and exit wound to his head. Part of the bullet entered Smith's brain and lodged in his skull above his right eye, and the other piece exited in front of his right ear. Smith also suffered multiple blows to his head, neck, shoulders, arms, sides, back, and buttocks. The bruising indicated that Smith had been struck with a long, narrow, rod-shaped object at least a quarter inch wide. Dr. Gunther estimated that Smith had been struck at least ten times but probably many more. She stated that the blows were very hard as evidenced by the immediate bruising on Smith's body. Smith suffered at least six blows to his head, one of which fractured his skull at the back of his head. Dr. Steven Symes, a forensic anthropologist, opined that this head injury was inflicted after the gunshot wound to Smith's head. Although the gunshot wound to the head was the worst injury and would by itself have caused death, Dr. Gunther testified that the cause of death was a combination of all of the injuries.

Based upon the above evidence, the jury convicted Sims of especially aggravated burglary and first degree premeditated murder.

*Sims*, 2014 WL 7334202, at *1-3.   The Tennessee Supreme Court affirmed the Petitioner's

convictions and sentences on direct appeal.   *See State v. Sims*, 45 S.W.3d 1, 5 (Tenn. 2001).

## B. POST-CONVICTION PROCEEDINGS

In the post-conviction trial court, Sims raised claims that are relevant to his motion for

partial summary judgment.   Specifically, he raised claims that the prosecution withheld evidence

favorable to the defense; ineffective assistance of trial counsel for failure to adequately cross-

examine Mitchell about his false testimony and lack of credibility[2] and for failure to pursue

pretrial motions based on *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405

U.S. 150 (1972); and prosecutorial misconduct surrounding Mitchell's testimony.   (ECF No. 47-

1 at PageID 2842–43, 2849–50, 2852–53, 2872–73.)

**1.   The *Brady* Claim**

On October 11, 2008, the post-conviction trial court denied Sims's *Brady* claim in the

initial *pro se* petition because no proof was presented.   (ECF No. 47-1 at PageID 2928.)

Specifically, the court stated,

> 6) **The conviction was based on the failure of the prosecution to disclose to the defense evidence favorable to the defendant.**   No proof was offered of the existence of any exculpatory or *Brady* material not timely turned over to the petitioner.

(*Id.*)

**2.   The Ineffective Assistance Claims**

Sims alleged that his trial counsel failed to: (a) adequately cross-examine his cousin Brian

Mitchell; and (b) file adequate pretrial motions seeking compliance with constitutional, statutory,

and local rules governing disclosure of discovery, specifically citing *Brady* and *Giglio* for the

proposition that, if counsel had done so, he "would have learned of the arrangement between Brian

Mitchell and the district attorney's office in which he agreed to testify against Mr. Sims in

exchange for a reduced charge and/or a lesser sentence."   (ECF No. 47-1 at PageID 2843, 2849–

50, 2852.)

---

[2] Mitchell was specifically named as one of the witnesses because "upon information and belief, [he] had in fact made a deal with prosecutors for his testimony in exchange for a lesser charge or sentence."   (ECF No. 47-1 at PageID 2850.)

### a. Cross-Examination of Mitchell

The post-conviction trial court denied Sims's ineffective assistance claim for failure to adequately cross-examine Mitchell as stated in the initial post-conviction petition because the claim was repeated in the amended petition in greater detail. (*Id.* at PageID 2927–28.) As to the claim in the amended petition, the post-conviction trial court found that Mitchell was thoroughly cross-examined and stated,

> In this court's reading of the trial record, no witness called by the State seemed to have been subjected to anything less than appropriate cross-examination. Therefore this issue will only be discussed as to Brian Mitchell, who was himself thoroughly cross-examined. The defense filed a Motion for Disclosure of Impeaching Information, which was granted by the trial court. Therefore if there were any promises of favoritism or deals made by the State to Mr. Mitchell for his testimony, the State had a duty to turn them over to the petitioner.
>
> Brian Mitchell, the petitioner's co-defendant, testified against him at trial. Prior to his testimony, his attorney Bill Anderson testified under oath in front of the jury that no offers or deals had been made to or with Brian Mitchell by the State for his testimony. Mr. Mitchell also testified to this under oath in front of the jury at trial. However, in testifying for the petitioner at one of the hearings on this petition, he recanted, stating that he had lied, and that he had made a deal with the State for his testimony when he met with both prosecutors, and then with the "black" prosecutor, twice while his attorney was not present. He stated as follows:
>
> Q. Now, the first time that you and Mr. Anderson talked to the prosecutors which prosecutor are we talking about? Were they the same one[s] at Vincent Sims' trial?
> A. Yes.
> Q. Was one of them white and one of them black?
> A. Right.
> Q. Was there any point at which Mr. Anderson left the room and left you with the prosecutors?
> A. Right.
> Q. Did Mr. Anderson say anything when he left the room?
> A. Yeah. He told me whatever we discussed or whatever we do we keep it between me and him.
> Q. The me you're referring to is the prosecutors?
> A. Right.
> Q. What did you take that to mean?

9

A. I really didn't understand at the time, you know what I'm saying, what they mean.

Q. Was there any discussion about any deal at that point?

A. Yeah.

Q. What discussion was there?

A. Oh, they told me they were going to give me less time for my testimony if I testify on Sims, on my charge partner.

Q. Did they say anything about the murder charge that you were facing?

A. They say they were going to drop it.

Q. Did they talk any particular number of years for any sentence that you may get?

A. Well, they said -- they had said 15.   He had said he was going to try and get him 15 years and give me four years, something like that.

Q. And did you tell Mr. Anderson anything about this?

A. No.

Q. And why was that? Do you know?

A. Well, I guess because, you know, what he said.

Q. Because of what Mr. Anderson had said to you?

A. Yeah.

Q. And are you referring to what he said to you when he said whatever you talk about is between you and them?

A. Yeah.

Q. Okay. Now, was there -- the second time you met with the prosecutors was it the same prosecutors or just one of them or what?

A. The same one.

Q. Which one?

A. The black one.

Q. And was there any mention of any deal for you at that time?

A. Yeah. He said he was going to give me 30 years.

Q. 30 years. What about the murder charge?

A. That he was going to drop the murder charge and give me 30 years, make me plea out for 30 years.

Q. Now, you at some point did enter a guilty plea in this case; is that right?

A. Right.

Q. And how much time did you get?

A. 30 years.

Q. For what crime?

A. For a burglary charge.

(*Id.* at PageID 2932–33.)

The post-conviction trial court assessed the credibility of the prosecutors involved, stating

The two prosecutors at trial were Lee Coffee, who is African-American, and James Lammey, who is Caucasian.   Lee Coffee testified at one of the hearings on

10

the petition to this issue as follows:

Q. At any time did you meet with Mr. Mitchell without his counsel being present?
A. I've never, ever met with Mr. Mitchell without his attorney being present.   I've never met with any defendant on any case in the twenty one years that I've served as a prosecutor without that person's attorney being present.
Q. And did at any time was there an agreement made with Mr. Mitchell that if he said certain things that the state would give him a good offer?
A. We never had an offer, never had an agreement with Mr. Mitchell or we never had an agreement with his attorney, Mr. Anderson, at all concerning the disposition of his case should he testify against Mr. Sims.  What we told Mr. Mitchell and what we told Mr. Anderson is that we would talk to the family members of the victims after the case against Mr. Sims had been concluded and we would go over his testimony, Mr. Mitchell's testimony, with the family members, that the family members would be present in the courtroom, they'd have an opportunity to evaluate his testimony, to evaluate his truthfulness or lack thereof, and after he had testified and after Mr. Sims' case had been concluded, after discussing those issues with the family members that we would make a recommendation to Mr. Anderson and Mr. Mitchell about a possible disposition of the charges against him.

We never had any specific agreements.  In fact, one of the interesting things about the case is after we met with the family members, after Mr. Sims' case was concluded the first reaction from the family members -- and it strikes me as if it was yesterday --they looked at me, went okay, so when do we try Mr. Mitchell.

And we talked to the family members about that and about Mr. Mitchell's testimony, and after discussing it with the family members we were able to make a recommendation based on the family's consent and based on what they thought was the right thing to do because Mr. Mitchell had in fact, taken the stand, had testified and we believed that he testified honestly and truthfully in regards to what our proof was.

We tendered an offer to Mr[.] Anderson at that point, which frankly Mr. Anderson did not like, frankly his client did not like, and at some point we were getting ready to set that case for trial because Mr. Anderson and Mr. Mitchell thought that they should be allowed to plead to a lot less time than the family had given or agreed with the State of Tennessee that we could make on Mr. Mitchell's case.

And that case almost got set for trial because Mr. Anderson and Mr. Mitchell thought -- and I believe if my recollection serves me correctly that we had recommended thirty years on the case as an out of his range sentence because Bryan Mitchell was a Range 1 standard offender but he agreed to plead to a sentence that was outside of his range in order to avoid more time at trial.

11

And that case almost was set for trial because Mr. Mitchell and his lawyer did not like the recommendation that we were authorized to make by the family of this victim.

(*Id.* at PageID 2934–35.)

The post-conviction trial court found that "Brian Mitchell's testimony at the hearing on this petition defies belief." (*Id.* at PageID 2935.) The court found that Anderson and the two prosecutors, who had since become criminal court judges, were "all three highly respected attorneys in the Shelby County legal community." (*Id.*) The court said that the "suggestion that they all conspired to commit a fraud on the judicial system is simply not credible." (*Id.*) The court determined that Coffee's testimony was "not only highly credible, but makes perfect sense and agrees with Bill Anderson's testimony at trial about the way proffered testimony of co-defendants is usually secured by the District Attorney's office in Shelby County." (*Id.*)

Regarding Mitchell, the court stated, "[i]t is fairly clear to this court that now that Mitchell has gotten his 30-year deal, he is trying to help the petitioner by committing perjury for him. He has nothing to lose by making up this story now." (*Id.*) The court ultimately found that "Mitchell's testimony at trial was neither misleading, false or inappropriate, and he was adequately cross-examined." (*Id.* at PageID 2936.)

### b.  Pretrial Motions

Sims alleged that his counsel failed to file adequate pretrial motions seeking compliance with constitutional, statutory, and local rules governing disclosure of discovery and specifically cited *Brady* and *Giglio* for his contention that, if counsel had done so, he "would have learned of the arrangement between Brian Mitchell and the district attorney's office in which he agreed to testify against Mr. Sims in exchange for a reduced charge and/or a lesser sentence." (ECF No.

47-1 at PageID 2852.)

The post-conviction trial court stated,

> 11. **Counsel failed to file adequate pre-trial discovery motions (specifically Brian Mitchell's impeaching material).**   No proof has been shown that the petitioner's counsel failed to file any necessary pre-trial discovery motions.   The defense filed a Motion for Disclosure of Impeaching Information, which was granted by the trial court.   Therefore, if there were any promises of favoritism or deals made by the State to Mr. Mitchell for his testimony, the State had a duty to turn them over to the petitioner.   This court finds in allegation #5, above, that no such deal was made.   This allegation fails for lack of proof.

(*Id.* at PageID 2951.)

### 3.  Prosecutorial Misconduct

Sims asserted a claim of prosecutorial misconduct based on Mitchell's purported arrangement to testify at trial.   (ECF No. 47-1 at PageID 2872.)   He alleges,

> 69. The facts supporting this claim, include, but are not limited to: the State of Tennessee arranged for Brian Mitchell, Mr. Sims' co-defendant, to testify at Mr. Sims' trial.

> 70. In exchange for that testimony, Mr. Mitchell was allowed to plead to lesser charges and receive a lesser sentence for his participation in the events surrounding Mr. Smith's death.

> 71. During and before Mr. Sims' trial, the prosecution team representing the State of Tennessee, Mr. Mitchell's attorney, and Mr. Mitchell all denied the existence of such an arrangement for Mr. Mitchell's testimony.

(*Id.* at PageID 2872.)   Sims argued that the claim was not waived because the information was not available at trial due to its concealment by the State, Mitchell, and his attorney.   (*Id.* at PageID 2873.)

The post-conviction trial court found these allegations to be without merit based on its analysis of the related ineffective assistance of trial counsel claim about Mitchell's cross-examination.   (*Id.* at PageID 2974.)

13

None of these issues were exhausted on post-conviction appeal.   (*See* ECF No. 47-15.)

## III.   STANDARDS OF REVIEW

### A.  EXHAUSTION AND PROCEDURAL DEFAULT

A federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts.   28 U.S.C. §§ 2254(b) & (c).   *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).   The petitioner must "fairly present"[3] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999).   Tennessee Supreme Court Rule 39, effective June 28, 2001, eliminated the need to seek review in the Tennessee Supreme Court to "be deemed to have exhausted all available state remedies."   *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) ("*Adams* not only requires the federal courts to ensure that the state courts have the first opportunity to review and evaluate legal claims . . . but also mandates that the federal courts respect the duly-promulgated rule of the Tennessee Supreme Court that recognizes the law and policy-making function of that court and the court's desire not to be entangled in the business of simple error correction").

---

[3] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citations omitted).   Nor is it enough to make a general appeal to a broad constitutional guarantee.   *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 87–88 (1977); *see Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment") (internal quotation marks and citation omitted).[4] In general, however, "we may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule." *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

When a petitioner has failed to present a claim to the state courts and no state remedy remains available, the claim is procedurally defaulted. *Robertson v. Fender*, No. 20-4215, 2021 WL 1978359, at *2 (6th Cir. Apr. 28, 2021)).[5]

Under either scenario, a petitioner must show cause to excuse his failure to present the claim and actual prejudice stemming from the constitutional violation or, alternatively, that a

---

[4] The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. *Walker*, 562 U.S. at 315. A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* at 316 (quoting *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009)). "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id.* (quoting *Beard*, 558 U.S. at 54.) (internal citations & quotation marks omitted).

[5] To avoid procedural default, federal law requires a federal habeas petitioner in Tennessee to present his federal claims to the Tennessee Court of Criminal Appeals. *Covington v. Mills*, 110 F. App'x 663, 665 (6th Cir. 2004).

failure to review the claim will result in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 320–21 (1995); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (same). The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *Schlup*, 513 U.S. at 321; *see House v. Bell*, 547 U.S. 518, 536–39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

## B.  MERITS REVIEW

Where a claim has been adjudicated on the merits in state court, the writ is only granted if the adjudication:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [Antiterrorism and Effective Death Penalty Act "AEDPA"] standard," which "demands that state-court decisions be given the benefit of the doubt." *Pinholster*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Pinholster*, 563 U.S. at 181–82, 185. As for challenges under §2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, . . . [t]he prisoner bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013)

16

(quoting 28 U.S.C. § 2254(e)(1)).  A state court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion.  *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Rice v. Collins*, 546 U.S. 333, 341–42 (2006) ("Reasonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination.").[6] The Supreme Court has described this standard as "demanding but not insatiable" and has emphasized that "deference does not by definition preclude relief."  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (internal quotation marks and alteration omitted).

## C. SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, on motion of a party, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment "bears the initial burden of demonstrating the absence of any genuine issue of material fact."  *Mosholder v. Barnhardt*, 679 F.3d 443, 448 (6th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of

---

[6] In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was "'unreasonable,'" or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence."  *Wood*, 558 U.S. at 299.  The Court ultimately found it unnecessary to reach that issue, and left it open "for another day".  *Id.* at 300-01, 303 (citing *Rice*, 546 U.S. at 339, in which the Court recognized that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable).  In *Titlow*, 571 U.S. at 18, the Supreme Court applied § 2254(e)(1)'s "clear and convincing" standard but cautioned that "[w]e have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1), and we need not do so here."

material fact." *Mosholder*, 679 F.3d at 448–49 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"In considering a motion for summary judgment, [a court] must draw all reasonable inferences in favor of the nonmoving party." *Phelps v. State Farm Mut. Auto. Ins. Co.*, 736 F.3d 697, 702–03 (6th Cir. 2012) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Phelps*, 736 F.3d at 703 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). "[A] mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in [his] favor." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 252).

Rule 12 of the Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rules") permits federal courts to apply the Federal Rules of Civil Procedure to petitions for habeas corpus "to the extent that they are not inconsistent with any statutory provision of these rules." *See* Habeas Rule 12; *see Black v. Carpenter*, 866 F.3d 734, 742–743 (6th Cir. 2017) (refusing to apply summary judgment to habeas intellectual disability claims); *see Townsend v. Hoffner*, No. 2:13-CV-14187, 2014 WL 2967949, at *2 (E.D. Mich. July 1, 2014). The AEDPA's significant deference to a state court's resolution of factual issues guides summary judgment review in habeas cases. A federal habeas court must presume the underlying factual determinations of the state court to be correct unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Malone v. Fortner*,

No. 3:09-0949, 2013 WL 1099799, at *2 n.3 (M.D. Tenn. Mar. 14, 2013) ("summary judgment rules in evaluating the evidence do not apply given the statutory presumption of correctness of facts found by the state courts").   The Court applies general summary judgment standards on federal habeas review only insofar as they do not conflict with the language and intent of the AEDPA.

## IV.   FACTS

Sims asserts that the following undisputed material facts support the portions of his *Brady*, false testimony, and prosecutorial misconduct claims for which he seeks summary judgment:

Forrest Smith was shot once when he came home to find two men burglarizing his house.   Upon finishing its investigation, the Memphis Police Department concluded that Smith confronted the burglars with a .380 pistol, and he received a gunshot wound after a scuffle broke out. Police identified Vincent Sims and Brian Mitchell as the burglars who broke into Smith's home, and the Grand Jury indicted them for premeditated murder, felony murder, and aggravated burglary.

Before Sims's trial, the prosecution told Mitchell that the victim's family was going to watch him testify against Sims. The prosecution told Mitchell that when Sims's trial concluded it would go over his testimony with the family, and it would thereafter arrive at a recommendation for disposing of the charges against him. While the court had ordered the prosecution to disclose anything that might give the State's witnesses an interest, bias, or inducement to testify or color testimony, and while the prosecution agreed that it would do so, the prosecution did not inform defense counsel of the incentive it gave Mitchell for his testimony.

At Mr. Sims's trial, Mitchell testified that while he was outside in Smith's driveway he heard gunfire inside Smith's home. Mitchell testified that Sims thereafter came out of Smith's home and the two drove away. As the victim's family watched, Mitchell testified that during the car ride Sims said he killed the victim because the victim saw his face.

The prosecution led Mitchell through testimony designed to eliminate any concern that his story was anything but the truth.

Q:   Has anybody, the State of Tennessee, Mr. Lammey, or myself, made you any promises in order to get you to testify?

19

A:      No, sir.

Q:      And has anybody made you any deals in order to get you to testify?

A:      No, sir.

Q:      What have we told you about your testimony?

A:      You told me - just told me that I - I go to the penitentiary.

Q:      And other than having told you to tell the truth, have we told you anything else about your testimony?

A:      No, sir.

On cross-examination, Mitchell reiterated that he had no incentive for his testimony.

Q:      And you say - Well, let me ask you about your expectations. You say no deal has been made to you at this point?

A:      Yes, sir.

Q:      You've agreed to testify and you expect to go to trial on this case, on your case after this one goes?

A:      Yes, sir.

Q:      And face the full range of punishment?

A:      Yes, sir.

Q:      You don't expect any plea bargain?

A:      No, sir.

Q:      All right. Did anyone ever advise you that your charge might be reduced below murder first degree to a murder second degree or involuntary manslaughter?

A:      No, sir.

Q:      Do you think that's a possibility?

A:      I don't know.

20

In its guilt stage closing argument the prosecution relied on Mitchell's "saw his face testimony to argue that Sims committed premeditated murder. It told the jury it could trust that testimony because, as Mitchell testified, he had no motive to lie. The jury credited Mitchell's testimony and convicted Mr. Sims of premeditated murder.

At the sentencing hearing, the prosecution relied on Mitchell's "saw his face" testimony to establish the avoiding arrest aggravating circumstance. It told the jury that it considered that circumstance the most significant reason to sentence Mr. Sims to death, and that it alone outweighed all the evidence Mr. Sims presented at the sentencing hearing. The jury again credited Mitchell's "saw his face" testimony. It found the avoiding arrest aggravating circumstance and sentenced Sims to death on its premeditated murder conviction.

After the proceedings against Sims concluded, the prosecution followed through on the representations it made to Mitchell. It went over Mitchell's trial testimony with the victim's family. After it did so, the family authorized the prosecution to tender Mitchell a plea bargain dismissing the murder charges and sentencing him to thirty years on the aggravated burglary charge. Shortly after the trial court denied Mr. Sims's new trial motion, the prosecution set about disposing of the charges against Mitchell as the victim's family had authorized.

Prosecuting attorneys Coffee and Lammey wrote a memorandum asking their supervisor to approve the deal that the victim's family had authorized. The prosecutors wrote that "Based in large part on Mitchell's testimony, the jury convicted Sims of premeditated murder and sentenced Sims to die .... We could not have gotten Death against Sims without Mitchell's truthful cooperation." Coffee then appeared at Mitchell's guilty plea hearing and recommended that the court dismiss the murder charges against Mitchell and sentence him to thirty years on the aggravated burglary charge. The court accepted Coffee's recommendation and Mitchell's plea.

(*See* ECF No. 96-1 at PageID 6185–88 (citations omitted); *see also* ECF No. 96-2.)

Respondent argues that certain facts Sims presents as undisputed are not material to the claims at issue.   (*See* ECF No. 107 at PageID 7328–30.)   Respondent objects to Sims's filing of a separate statement of facts because the state court's factual findings are entitled to deference, and the scope of review is limited to the state court's determination of the merits of the claims based on the record before it.   (*Id.* at PageID 7329–30.)   Respondent contends, based on

*Pinholster*, 563 U.S. 170, and 28 U.S.C. § 2254(e), that the asserted undisputed facts that are outside the record are not "facts" that can properly substantiate Sims's motion for summary judgment. (*Id.* at PageID 7330.) Further, Respondent refers to cited documents for a true and accurate statement of the contents in lieu of Sims's narrative, especially where Sims has culled his recitation of portions of the State's response. (*See id.* at PageID 7332, 7335–38, 7342, 7345, 7350–52.)

Respondent objects to Sims's assertion that the Memphis Police Department made conclusions about the nature of the confrontation between Smith and Sims based on a statement in the arrest report because arrest reports contain hearsay. (ECF No. 107 at PageID 7330.)

Respondent disputes Sims's assertion that, at the guilt stage closing argument, Coffee told Sims's jury that Mitchell was not motivated to lie. (ECF No. 107 at PageID 7341.) Respondent contends that, in pertinent part, the prosecutor made the following statements,

> When you judge the credibility of witnesses, look at what Brian Keith Mitchell had to tell you. Mr. Nance would suggest to you that, well, of course, he testified that way. He has a motive. He has some deal with the State of Tennessee. I don't make deals with criminals. I don't make deals with killers. Brian Mitchell doesn't have a deal with the State of Tennessee. What he told you and what his lawyer told you, he said the only deal he has is that he's going to go to the penitentiary for his participation in this crime. That's the only deal that Brian Keith Mitchell has.

(*Id.* at PageID 7341–42; *see* ECF No. 46-15 at PageID 2109-10.)

Respondent objects to the assertion that the prosecution went over Mitchell's testimony with the victim's family, and the family authorized dismissing the first-degree murder charges and sentencing Mitchell to thirty years on aggravated burglary to the extent that the documents supporting this purported undisputed fact are outside the record and cannot substantiate the motion for summary judgment. (ECF No. 107 at PageID 7344.) Notwithstanding that objection,

22

Respondent states that it is undisputed that the prosecutor spoke with Smith's family members after Sims's trial.  (*Id.*)  Respondent notes that Coffee testified that he almost set Mitchell's case for trial because "Mr. Mitchell and his lawyer did not like the recommendation that we were authorized to make by the family of this victim" and "[w]e never had an offer, never had an agreement with Mr. Mitchell or we never had an agreement w[]th his attorney, Mr. Anderson, at all concerning the disposition of his case should he testify against Mr. Sims."  (*Id.* at PageID 7344–45; *see* ECF No. 47-11 at PageID 3761, 3763.)

Respondent clarifies that Coffee's post-conviction testimony exceeds Sims's culled recitation of the facts.  (ECF No. 107 at PageID 7350; *see* ECF No. 47-11 at PageID 3759–65.) Further, Respondent argues that Sims's post-conviction counsel Paul Morrow and Marjorie Bristol did not recognize that Coffee's testimony provided a factual basis for claims that: (1) the prosecution withheld evidence of the arrangement with Mitchell and the victim's family; (2) the prosecution elicited and condoned Mitchell's false testimony that there was no bargain for his testimony; and (3) the prosecution misled Sims's jury at closing argument when he told the jury that nothing motivated Mitchell to lie.  (ECF No. 107 at PageID 7351; *see* ECF No. 96-7 at PageID 6270–71; *see also* ECF No. 96-8 at PageID 6272–73.)  Respondent argues that Morrow and Bristol did not make a strategic decision to forego these claims; they simply did not recognize that Coffee's post-conviction testimony gave rise to and supported his claims.  (ECF No. 107 at PageID 7352.)

In analyzing Sims's claims, the Court is limited by the deference given to the state court's determination of facts under 28 U.S.C. § 2254(e)(1) and *Pinholster* and 28 U.S.C. § 2254(d)(2) to the extent the claim has been adjudicated on the merits.

## V.    ANALYSIS

None of the claims addressed in this motion were exhausted in the state courts.    However, the procedural history differs as to each claim.    The Court must determine whether merits review of these claims is appropriate based on the procedural history and Sims's ability to prove cause and prejudice or a miscarriage of justice to overcome the procedural default.

Sims acknowledges that his summary judgment claims were not raised in the state court proceedings and that Respondent raises procedural default as a defense.    (ECF No. 96-1 at PageID 6194.)    Sims argues that he can overcome the procedural default of his summary judgment claims and that he is entitled to relief on the merits.    (*See id.*)    Sims asserts that procedural default of these claims does not preclude the grant of habeas relief because: (1) the State has no legitimate interest in insulating from review the prosecutorial misconduct used to obtain Sims's conviction and death sentence; (2) state misconduct provides cause for not raising these claims in the state court proceedings; and (3) ineffective assistance of post-conviction counsel provides cause for not raising these claims in the post-conviction proceedings.    (ECF No. 96-1 at PageID 6194–6201.)

Respondent argues that each of Sims's summary judgment claims are procedurally defaulted; that Sims has admitted that the factual basis for his *Brady* claim first became available in the state post-conviction proceedings; that Sims's reliance on *Martinez v. Ryan*, 566 U.S. 1 (2012), to overcome the procedural default of his summary judgment claims is misplaced; and that Sims has not demonstrated that actual prejudice resulted from the alleged constitutional violations. (ECF No. 108 at PageID 7356, 7358–61.)    Respondent argues that each of the claims are procedurally defaulted and that he is entitled judgment as a matter of law.    (*Id.* at PageID 7354-

61.)[7]

In reply, Sims asserts that there is no factual dispute about the State's misconduct.   (ECF No. 118 at PageID 7452–54.)   Sims contends that he has demonstrated the materiality of the State's misconduct and, therefore, has established prejudice to overcome procedural default. (ECF No. 118 at PageID 7455–57.)

## A.  LEGITIMATE STATE INTEREST

Sims argues that the State has no legitimate interest in insulating prosecutorial misconduct from federal habeas merits review.   (ECF No. 96-1 at PageID 6195.)   Sims argues that prosecutorial misconduct of the kind at issue in this case "shocks the conscious."   (*Id.*)   He asserts that equity provides the foundation for the procedural default doctrine, and the doctrine seeks to protect a State's legitimate interest in finality.   (*Id.*)   Sims contends that a State has no legitimate interest in defending a conviction and death sentence that its prosecutors cheated to obtain.   (*Id.*)[8] He argues, relying on *Jenkins v. Artuz*, 294 F.3d 284, 294–95 (2d Cir. 2002), that a finding of procedural default would reward the prosecutor's malfeasance, and the prosecutor's vouching for false testimony has "no place in the administration of justice . . . ."   (*Id.* at PageID 6191, 6195–96.)

---

[7] Respondent also argued that these claims were procedurally defaulted in his motion for summary judgment.   (*See* ECF No. 98-1 at PageID 6399–6401.)

[8] In the Joint Statement, Sims argues that his interest in federal review of his conviction and death sentence outweighed any interest that the State has in defending prosecutorial misconduct.   (*See* ECF No. 64 at PageID 5938–42.)   He asserts that his interest in the "the constitutional propriety of his conviction and death sentence is the only legitimate interest at play." (*Id.* at PageID 5940.)

Sims argues that the State concedes that it does not have a legitimate interest in maintaining "the corrupt judgment against Sims."   (ECF No. 118 at PageID 7454–55.)   Sims asserts that this Court should recognize Respondent's concession and address the merits of Sims's misconduct claims.   (*Id.* at PageID 7455.)

Despite Sims's arguments, the standard for determining whether a petitioner can overcome procedural default is not whether the State had a legitimate interest in prosecutorial misconduct, but whether Sims has demonstrated cause and prejudice or actual innocence to overcome procedural default.   Sims cites *Jenkins*, a case from the United States Court of Appeals for the Second Circuit, in support of his argument that the prosecutorial misconduct claim should be addressed on the merits.   (ECF No. 96-1 at PageID 6195.)   Unlike the claims presented here, *Jenkins* involves a claim that was exhausted and adjudicated on the merits in the state court.   *See Jenkins*, 294 F.3d at 291.   Therefore, the merits analysis in *Jenkins* does not apply.

In the reply, Sims cites one Sixth Circuit case, *Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 483 (6th Cir. 2007), in support of his position that the State's lack of legitimate interest in insulating the review of prosecutorial misconduct allows for review on the merits.   (*See* ECF No. 118 at PageID 7455.)   *Langley* is an employment case addressing wrongful discharge, employment discrimination, violations of the Employee Retirement Income Security Act, and breach of contract.   Sims does not explain, nor has this Court been able to ascertain, *Langley*'s relevance to the instant habeas proceeding and Sims's procedural default.

Sims argues that procedural default is a non-jurisdictional affirmative defense that a respondent cannot waive.   (ECF No. 118 at PageID 7455.)   Sims asserts that the Court should recognize Respondent's concession in not addressing the argument about no legitimate state

interest.   (*Id.*)   However, Respondent has clearly asserted that the claims at issue are procedurally defaulted in his answer, in response to the motion for partial summary judgment, and in Respondent's motion for summary judgment.   (*See* ECF No. 52 at PageID 5330-32; *see* ECF No. 108 at PageID 7356–61; *see also* ECF No. 98-1 at PageID 6399–6406.)   Sims's argument that the Court should review his claims on the merits because the State has no legitimate interest in insulating prosecutorial misconduct from habeas review is without merit.

### B.  STATE MISCONDUCT AS CAUSE FOR PROCEDURAL DEFAULT

Sims argues that, under Tennessee law, remedies for claims that the prosecution withheld evidence, presented false testimony, or prosecutorial misconduct are available through a motion for new trial or on direct appeal.   (ECF No. 96-1 at PageID 6196.)   He acknowledges that the claims at issue were not presented in these state court proceedings.   (*Id.*)   However, he asserts that the State's misconduct was the cause for his failure to present these claims.   (*Id.*)

Sims argues that, before trial, his trial counsel filed a Motion for Exculpatory Evidence (ECF No. 46-1 at PageID 591–93) and a Motion for Disclosure of Impeaching Information (*see id.* at PageID 604–605) moving the trial court to order the State to provide exculpatory evidence and impeachment information including "anything which could arguably or reasonably create an interest or a bias in the witness in favor of the State or against the Defendant, or act as an inducement to testify or to color testimony."   (ECF No. 96-1 at PageID 6196–97.)

The State responded to the motion for exculpatory evidence by stating,

> The State of Tennessee is fully cognizant of its duty to defendant to provide a fair trial. <u>Brady vs. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); <u>Mooney vs. Holohan</u>, 294 U.S. 103, 55 S. Ct. 340, 79 L. Ed. 791; <u>Napue vs. Illinois</u>, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).   The State of Tennessee will fully comply with the requirements of the decisions cited herein; however a criminal defendant has no constitutional or statutory right to discover before trial

the contents of the prosecution's file.  U.S. v. Agurs, supra; Hunter v. State, 222 Tenn. 672, 440 S.W. 2d 1 (1969).   Moreover, representatives of the State of Tennessee are under no duty to report sua sponte to the defendant all they learn about the case and about their witnesses.  In re Imbler, supra, there being no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.  Moore v. Illinois, 408 U.S. 786, 92 S. Ct. 2562, 33 L. Ed. 2d 706; Giglio v. U.S., 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

(ECF No. 46-1 at PageID 594–95.)   In response to the Motion for Disclosure of Impeaching Information, the State agreed "to advise defense counsel promptly of any consideration or promises of consideration given to or made on behalf of government witnesses . . .."   (ECF No. 46-1 at PageID 606.)   The trial court granted Sims's motions.   (Id. at PageID 638–39.)

Sims argues that, before trial, the prosecution gave him no indication of the arrangement between Mitchell and Smith's family and was silent on the issue of a promise or bargain.  (ECF No. 96-1 at PageID 6197.)   Further, Sims contends that the State elicited and condoned Mitchell's testimony affirming that no bargain existed, and then told the jury that Mitchell had no motivation to lie.  (Id.)   Sims contends that the prosecution's continuing misconduct made it impracticable for Sims to present his summary judgment claims in the Tennessee state court proceedings.  (Id. at PageID 6197–98.)

Respondent asserts that Sims has no genuine basis to argue that an objective factor external to his defense impeded his effort to present his claim in the state courts because Coffee testified in the post-conviction evidentiary hearing about the arrangement with Mitchell.  (ECF No 108 at PageID 7358.)   Thus, Sims cannot establish the cause necessary to excuse his procedural default. (Id.)

Sims once again counters that Respondent concedes that the procedural default defense does not insulate him from the prosecutorial misconduct claims and that Sims is not required to

demonstrate cause for the default.   (ECF No. 118 at PageID 7458.)   Further, Sims argues that Respondent's broad assertion fails to recognize that State misconduct impeded him from raising his claims at a time when doing so would have made them available to the state court for merits review.   (*Id.* at PageID 7458–59.)

The suppression of material evidence would excuse the procedural default of a claim.   *See Jones v. Bagley*, 696 F.3d 475, 486–487 (6th Cir. 2012) ("S]howing an actual *Brady* violation is itself sufficient to show cause and prejudice.").   However, in the instant case, Sims made arguments in his post-conviction petitions about Mitchell's purported arrangement with the prosecution and heard testimony in the post-conviction proceedings from Coffee about the arrangement.   Therefore, Sims was fully aware of the nature of any arrangement between Sims and the prosecution and the issues of false testimony and vouching before the trial court's post-conviction determination and could have pursued his claims to exhaustion at the state appellate court level.   He did not.

## C.  INEFFECTIVE ASSISTANCE OF POST-CONVICTION COUNSEL

Sims argues that the remedy for his summary judgment claims became first available, as a practical matter, during the state post-conviction proceedings.   (ECF No. 96-1 at PageID 6198.) He asserts that Justice Scalia's dissent in *Martinez* allows him to assert that the ineffective assistance of post-conviction counsel in not presenting these summary judgment claims provides cause for the procedural default because there is no difference between ineffective assistance of trial counsel claim and the instant prosecutorial misconduct claims.   (*Id.* at PageID 6198–6200.)

Sims argues that, during the post-conviction proceeding, his counsel pursued a claim that the State withheld evidence that it had an express *quid pro quo* deal with Mitchell to dismiss the

murder charges against him in exchange for his testimony.   (*Id.* at PageID 6200.)   Sims contends

that the factual basis for his summary judgment claims only became available when the prosecutor

Lee Coffee testifies that the State did not have a thirty-year *quid pro quo* deal with Mitchell which

included dismissal of the murder charges for a lone aggravated burglary charge.   (*Id.*)   Sims

argues that Coffee testified,

> We never had an offer, never had an agreement with Mr. Mitchell or we never had
> an agreement with his attorney, Mr. Anderson, at all concerning the disposition of
> his case should he testify against Mr. Sims. What we told Mr. Mitchell and what
> we told Mr. Anderson is that we would talk to the family members of the victims
> after the case against Mr. Sims had been concluded and we would go over his
> testimony, Mr. Mitchell's testimony, with the family members, that the family
> members would be present in the courtroom, they'd have an opportunity to observe
> his demeanor, they'd have an opportunity to evaluate his testimony, to evaluate his
> truthfulness or lack thereof, and after he had testified and after Mr. Sims' case had
> been concluded, after discussing those issues with the family members that we
> would make a recommendation to Mr. Anderson and Mr. Mitchell about a possible
> disposition of the charges against him. We never had any specific agreements.

(*See* ECF No. 96-1 at PageID 6200; *see* ECF No. 47-11 at PageID 3761–62.)   Sims contends that

this was the first time that the prosecution acknowledged the arrangement with Mitchell and the

victim's family.   (ECF No. 96-1 at PageID 6200–01.)   Sims asserts that his post-conviction

attorneys did not recognize that Coffee's testimony provided a factual basis for the instant

summary judgment claims and made no strategic decision to forego present these claims.   (*Id.* at

PageID 6201.)   Sims argues that the claims are plainly meritorious, and post-conviction counsel's

performance was deficient, establishing cause under *Martinez.*   (*Id.*)

In *Martinez*, 566 U.S. at 17, the Supreme Court recognized a narrow exception to the rule

in *Coleman*, "[w]here, under state law, claims of ineffective assistance of trial counsel must be

raised in an initial-review collateral proceeding . . . ."   .   In such cases, "a procedural default will

not bar a federal habeas court from hearing a substantial claim of ineffective assistance [of counsel]

at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id*.  The Supreme Court emphasized that

> [t]he rule of *Coleman* governs in all but the limited circumstances recognized here . . . . It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons.

*Id*.  The Supreme Court has not authorized extension of the *Martinez* procedural default analysis, allowing ineffective assistance of post-conviction counsel to serve as cause for the procedural default, to claims of prosecutorial misconduct.  The Sixth Circuit has specifically held that "*Martinez* is limited 'to claims of ineffective assistance of trial counsel that were procedurally defaulted by lack of or ineffective assistance of post-conviction counsel' and does not apply to *Brady* claims or claims of prosecutorial misconduct.  *Myers v. Osborne*, No. 17-5284, 2018 WL 4215638, at *3 (6th Cir. Apr. 12, 2018)*; see Abdur'Rahman v. Carpenter*, 805 F.3d 710, 714 (6th Cir. 2015) (refusing to extend *Martinez* to claims of prosecutorial misconduct).  Therefore, *Martinez* does not allow ineffective assistance of post-conviction counsel to serve as cause to overcome the procedural default of the instant summary judgment claims.  Sims has not presented a basis for merits review of the portions of Claims 3-5 raised in his motion for partial summary judgment under *Martinez*.

## VI.    CONCLUSION

The Court has rejected each of Sims's arguments to overcome the procedural default of the claims at issues in his motion for partial summary judgment.  Sims presented arguments in the state post-conviction proceedings that Mitchell had an arrangement with the prosecution in exchange for his testimony and had testified falsely at trial about the arrangement.  Sims obtained Coffee's testimony about the purported arrangement.  However, when Sims was denied relief in

31

the post-conviction trial court, he did not present these issues on appeal at the state level and did not exhaust his claims.   He has not demonstrated cause and prejudice or actual innocence to overcome the procedural default.   Because Sims has not demonstrated a basis for merits review of these claims, he has not demonstrated an entitlement to habeas relief.   The Motion for Partial Summary Judgment is DENIED.

IT IS SO ORDERED this 21st day of July, 2022.


 *s/John T. Fowlkes, Jr.*
JOHN T. FOWLKES, JR.
United States District Judge